753 A.2d 716 (2000)
332 N.J. Super. 293
Suzanne GOVITO, Plaintiff-Appellant,
v.
WEST JERSEY HEALTH SYSTEM, INC., West Jersey Physician Associates, P.A., trading as Recovery Network, Defendants-Respondents.
Superior Court of New Jersey, Appellate Division.
Argued May 17, 2000.
Decided June 21, 2000.
*719 Kathryn R. Renahan and Carol Schuler Harding, Westmont, for plaintiff-appellant (Earp Cohn, attorneys; Ms. Renahan and Ms. Harding, on the brief).
Thomas M. Walsh, Cherry Hill, for defendant-respondent West Jersey Health System, Inc. (Parker, McCay & Criscuolo, attorneys; Stacy L. Moore, of counsel; Debra S. Hantman, on the brief).
G. Wesley Manuel, Jr., Cherry Hill, for defendant-respondent West Jersey Physician Associates (Mr. Manuel, on the brief).
Before Judges CARCHMAN, LEFELT and LINTNER. *717 *718
*720 The opinion of the court was delivered by CARCHMAN, J.A.D.
In Bainhauer v. Manoukian, 215 N.J.Super. 9, 520 A.2d 1154 (App.Div.1987), we determined that the conditional special-interest privilege described in Coleman v. Newark Morning Ledger Co., 29 N.J. 357, 149 A.2d 193 (1959), applied to the publication of defamatory information by a physician concerning the conduct of another physician. We concluded that the policy implications attendant to the quality of health care in a hospital setting required the application of such privilege to that factual circumstance. This appeal presents the question of whether such privilege applies to a nurse who is defamed in the course of an "intervention" prompted by false allegations that the nurse was improperly diverting and using morphine. We conclude that such privilege does apply under these facts. We further conclude that the confrontation of the nurse in the presence of a secretary did not rise to the level of excessive publication or an abuse of the privilege. Lastly, we conclude that plaintiff failed to establish a sufficient basis to warrant submitting her claim for negligent infliction of emotional distress to the jury. Accordingly, we affirm the trial judge's involuntary dismissal of plaintiff's complaint.
We address the issues raised in the following factual and procedural context. Plaintiff Suzanne Govito served as a registered nurse at defendant West Jersey Health System, Inc.'s (WJHS) intensive care unit, working the 7:00 p.m. to 7:00 a.m. shift four to five shifts per week. On October 11, 1993, an empty morphine tubex (a syringe package containing morphine) was found in the nurses' lounge in the intensive care unit (ICU) of WJHS. Donna Floyd, who was then head nurse, was instructed by her superior, Kathy Pace, the Assistant Director of Nursing, to follow up on the incident by "pulling several months of narcotics sheets." Floyd "didn't know how to follow up" but "flipped through" the sheets not knowing what she was looking for. The sheets contained the sign-outs for morphine, which each nurse was required to sign every time she took morphine from its locked storage box. Floyd discovered that plaintiff's name appeared much more frequently than the other nurses'; in fact, plaintiff accounted for thirty-seven percent of the morphine signed out of the unit.
On November 3, 1993, after plaintiff had worked her regular shift, and had been awake for twenty-four hours, Floyd asked her to proceed to the nursing office. Instead, Floyd led her to a conference room where Pace was waiting with two investigators from the New Jersey State Department of Law and Public Safety. They had the narcotics sheets spread out before them. Plaintiff informed them that she was exhausted and wanted to get some sleep prior to talking to them, but they refused. For the next hour, the investigators asked plaintiff questions about her procedure for signing out morphine, and plaintiff realized that they were accusing her of being a drug user and diverter. Before they were finished, plaintiff told them she was too tired to think straight and left the room.
Plaintiff walked through the hall and saw a group of people gathered together, including Pace, Floyd, Joan Eddy, the Director of Nursing, Kim Russo, the head nurse supervisor in critical care, Denise Yheaulon, a fellow nurse, and defendant Recovery Network's Mari Oresic.
Yheaulon was a nurse at West Jersey who was a recovering alcoholic and drug addict. The night before, someone from Recovery Network had asked her to take part in an "intervention" that was to take place on the morning of November 3. She had taken part in about six prior interventions, although she had no formal training. She was not scheduled to work on November 3 and therefore was not there as a hospital employee. She contacted and asked her sister, Mariann Snyder, who was also a recovering addict, to accompany her to the intervention.
*721 According to plaintiff, Eddy said, "We know you took the drugs. We know you have a problem, and we have help for you." Plaintiff responded with a denial. Eddy repeated her statement and said that they had a room waiting for her at the Parkside Hospital, which was for drug and alcohol rehabilitation. Plaintiff asked Eddy if she was fired, and Eddy answered in the negative. Oresic introduced herself and told plaintiff that she had called plaintiff's husband and "he knew everything." All of this transpired in front of a secretary who, according to plaintiff, was "taking all of this in."
Plaintiff said she was going home, but was informed that she could not. As plaintiff walked to the parking lot everyone followed "like a three-ring circus," except for Snyder. As plaintiff entered her car, Yheaulon said they could not permit her to leave because it was a known fact that nurses who are caught diverting drugs commit suicide. She continued, saying that if plaintiff was innocent she should go back into the hospital and submit to a drug screen test. Plaintiff then announced to the group that she quit her job. Unidentified people walking by on the street witnessed the scene, and people inside the hospital looked out the windows to see what was going on. Plaintiff walked away to find a phone, and when she returned, the women had dispersed. She then drove home.
When she arrived home, plaintiff's husband, Michael Govito, asked her if she was addicted to drugs, and she answered in the negative. According to Michael, Oresic had called him at about 8:00 a.m. and said there was a "problem" with his wife, indicating that she was a drug addict and needed treatment. Oresic told him that plaintiff would be suicidal and that they had reserved a room for her at the Parkside Hospital, a drug treatment facility. According to Michael, he called Oresic back at 11:00 a.m. and asked her what kind of drug was involved, and she told him it was morphine.
Michael made an appointment for plaintiff to have a drug test that day, but plaintiff did not keep the appointment on their attorney's advice. Two days later, on November 5, 1993, plaintiff went to her family doctor who performed a drug screen test, which was negative, and found no track marks anywhere on her body. Plaintiff had seen the doctor six months earlier due to extreme fatigue, diarrhea, and weight loss. At that time, she had blood tests done, which were normal.
According to Jacqueline Fish, a nurse at WJHS, on November 4, Floyd called a meeting of the nurses and discussed protocol for the dispensing of medication; she also stated that some nurses are impaired. At the end of the meeting, Floyd announced that plaintiff had resigned. Although she did not specifically say so, Fish understood Floyd to be insinuating that plaintiff was a drug addict.
Plaintiff felt "horrible," "humiliated" and "embarrassed" after this incident and was barely able to get out of bed or care for her two children.
In February 1994, the State issued its investigation report. Plaintiff admittedly had violated, albeit unwittingly, hospital protocol by supplying morphine to patients without a doctor's order. She admitted to one-hundred occasions over a six-month period when she had signed out narcotics without appropriate documentation and had signed out morphine from another unit. She conceded that this behavior was typical of a drug diverter or user but denied being either. Ultimately, plaintiff consented to a two-year suspension of her nurse's license for the documentation infractions. At the time of trial, she had not reactivated her license because she felt her reputation was irreparably tarnished.
Plaintiff filed a complaint alleging libel and slander against defendants WJHS and Recovery Network as well as intentional or negligent infliction of emotional distress against the same two defendants.
*722 After the presentation of plaintiff's evidence to a jury, defendants moved for an involuntary dismissal pursuant to R. 4:37-2(b). Judge Little concluded that defendants' statements were protected by the Bainhauer privilege. He further concluded that plaintiff failed to establish that defendants abused the privilege. Finally, he found that plaintiff had failed to establish a sufficient basis to submit the issue of negligent infliction of emotional harm to the jury. He granted defendants' motion and dismissed the complaint. This appeal followed.
Plaintiff asserts that the trial judge erred in holding that plaintiff was subject to the same standard as a "public figure" and was obligated to demonstrate actual malice by clear and convincing evidence. She further claims that the Bainhauer privilege did not apply, and if it did apply, such privilege was lost because defendants recklessly and excessively published defamatory statements to third parties; moreover, such defamatory matters were not in the public interest. Finally, plaintiff claims that the trial judge erred by dismissing her claim for negligent infliction of emotional distress.
Our analysis of plaintiff's arguments on appeal requires a review of the applicable principles of law regarding defamation and the Bainhauer privilege.
A defamatory statement is one that is false and 1) injures another person's reputation; or 2) subjects the person to hatred, contempt or ridicule; or 3) causes others to lose good will or confidence in that person. Romaine v. Kallinger, 109 N.J. 282, 289, 537 A.2d 284 (1988). A defamatory statement "tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." Restatement (Second) of Torts § 559 (1977). "A plaintiff does not make a prima facie claim of defamation if the contested statement is essentially true." Hill v. Evening News Co., 314 N.J.Super. 545, 552, 715 A.2d 999 (App.Div.1998). To prove defamation, a plaintiff must establish damages and that the defendant "(1) made a defamatory statement of fact 2) concerning the plaintiff (3) which was false and (4) which was communicated to a person or persons other than the plaintiff." Feggans v. Billington, 291 N.J.Super. 382, 390-91, 677 A.2d 771 (App.Div.1996). The fifth element that must be proven is fault. Id. at 391, 677 A.2d 771; Bainhauer v. Manoukian, supra, 215 N.J.Super. at 31, 520 A.2d 1154. "[F]ault, by whatever standard it is to be measured, is as much an element of the cause of action as the defamatory publication itself." Ibid.
"The law of defamation distinguishes between public figures and private persons." Hill v. Evening News Co., supra, 314 N.J.Super. at 554, 715 A.2d 999. Fault in private defamation is proven by a negligence standard. Costello v. Ocean County Observer, 136 N.J. 594, 612, 643 A.2d 1012 (1994); Kass v. Great Coastal Express, Inc., 291 N.J.Super. 10, 17, 676 A.2d 1099 (App.Div.1996), aff'd in part, rev'd in part, 152 N.J. 353, 704 A.2d 1293 (1998). "Where public officials and other public figures are aggrieved by defamatory publications, the constitutionally mandated standard of fault which constitutes that element of the cause of action is the defendant's knowledge that the defamatory statement is false or his reckless disregard of its truth or falsity." Bainhauer, supra, 215 N.J.Super. at 31, 520 A.2d 1154. This has been called the "actual malice" standard. New York Times Co. v. Sullivan, 376 U.S. 254, 279-80, 84 S.Ct. 710, 726, 11 L.Ed.2d 686, 706 (1964). In this context, "actual malice" does not require the statement be made with ill will or spite, just "knowledge that it was false or with reckless disregard of whether it was false or not." Ibid.; McLaughlin v. Rosanio, Bailets & Talamo, Inc., 331 N.J.Super. 303, 313-14, 751 A.2d 1066 (App.Div.2000). (distinguishing the two fault standards applied to private versus public figures). "The classification of a plaintiff as a public *723 or private figure is a question of law to be determined initially by the motion or trial judge." Hill v. Evening News Co., supra, 314 N.J.Super. at 554, 715 A.2d 999.
Plaintiff argues that she was a private person, not a public figure. Defendants contend that to further public policy objectives, health care personnel have been considered limited public figures. Although Recovery Network correctly notes that the private versus public analysis may be irrelevant when asserting a privilege, the designation of plaintiff as a private or public person is relevant to her underlying cause of action. Cf. McLaughlin v. Rosanio, Bailets & Talamo, Inc., supra, 331 N.J.Super. at 313-15, 751 A.2d 1066. We therefore first address the issue of her status.
In Bainhauer, supra, an anesthesiologist sued a surgeon who made disparaging comments about his competency to various hospital personnel. We acknowledged the distinction between private persons and public persons in the context of a defamation action noting that in Sisler v. Gannett Co., 104 N.J. 256, 279, 516 A.2d 1083 (1986), the Supreme Court held
that when a private person with sufficient experience, understanding and knowledge enters into a personal transaction or conducts his personal affairs in a manner that one in his position would reasonably expect implicates a legitimate public interest with an attendant risk of publicity, defamatory speech that focuses upon that public interest will not be actionable unless it has been published with actual malice.
Any inquiry or analysis must focus on whether a nurse in a hospital setting falls within the scope of the "public interest" identified in Sisler. Plaintiff contends that she was not a "business" plaintiff, did not inject herself into any public controversy, had no access to the media, sought no media attention, was not a public official and did not have the fame and notoriety of a general-purpose public figure. She claims that no public concern was implicated because the defamatory statements here were not published to protect the public. While we agree that plaintiff was not a public official and sought no notoriety, plaintiff's argument fails to acknowledge the broader public interest in competent nurses and nursing care.
The role of nursing and nurses in a hospital setting has not been static but has dynamically responded to the changing nature of the delivery of health care services, specifically in a hospital setting. Cf. Pegram v. Herdrich, ___ U.S. ___, 120 S.Ct. 2143, 147 L.Ed.2d 164 (2000) (recognizing the evolution of health-care delivery as a result of the development of health maintenance organizations). Other jurisdictions have commented on these changes:
"[T]he role of the registered nurse has changed, in the last few decades, from that of a passive, servile employee to that of an assertive, decisive health care provider. Today, the professional nurse monitors complex physiological data, operates sophisticated lifesaving equipment, and coordinates the delivery of a myriad of patient services. As a result, the reasonably prudent nurse no longer waits for and blindly follows physicians' orders."
[Bleiler v. Bodnar, 65 N.Y.2d 65, 489 N.Y.S.2d 885, 479 N.E.2d 230, 234 (1985) (quoting l Louisell & Williams, Medical Malpractice, ¶ 16A.01).]
See also Maloney v. Wake Hosp. Sys., Inc., 45 N.C.App. 172, 262 S.E.2d 680, 684 (1980), review denied, 300 N.C. 375, 267 S.E.2d 676 (1980) ("[N]urses and other physicians' assistants play a much greater role in the actual diagnosis and treatment of human ailments than previously. The role of the nurse is critical ... in modern medicine. Her expertise is different from, but no less exalted than, that of the physician.") (citation omitted); Sermchief v. Gonzales, 660 S.W.2d 683, 689 n. 5 (Mo.1983) ("Professional nursing ... is in a period of rapid and progressive change in response to the growth of biomedical *724 knowledge, changes in patterns of demand for health services, and the evolution of professional relationships among nurses, physicians and other health professions.") (internal quotations omitted). The fully integrated health care system brings with it an understanding that within the scope of that public interest is the importance of insuring that nurses who are critical to the effective delivery of health care services are not substance-impaired. Our Supreme Court has recognized that the public has a "significant public interest" in a licensing board's inquiry into a professional's acts. McClain v. College Hosp., 99 N.J. 346, 362-63, 492 A.2d 991 (1985). The Court has also recognized that "while hospitals have broad discretionary powers in managing their affairs, including the selection of medical staff, their health-care powers are deeply impressed with a public interest and are fiduciary in nature." Desai v. St. Barnabas Med. Ctr., 103 N.J. 79, 90, 510 A.2d 662 (1986).
The quality of health care at hospitals is undoubtedly a matter of public interest and concern, and a nurse would reasonably expect that her actions implicate and fall within the scope of that legitimate public interest. She is an integral partner in the health care delivery network and is given responsibilities including, among other things, the implementation of physicians' orders and the active providing of health care review. There is imposed on a nurse a degree of trust and responsibility which is clearly part of the "public interest." We see little distinction between the public interest enunciated in Bainhauer and the circumstances described here. We conclude that a nurse, similar to a physician, is a "public figure" as described in Sisler. We deem it appropriate to apply to a nurse providing the nursing services ascribed to plaintiff the same higher standard of proof and fault as applied to the doctor in Bainhauer.
We now address the Bainhauer privilege and its applicability here. "Although a statement may be defamatory, under certain circumstances embodied in the concept of qualified privilege, even defamatory statements will be protected." Kass v. Great Coastal Express, Inc., supra, 291 N.J.Super. at 19, 676 A.2d 1099. This privilege is a "historical, traditional common-law privilege which arises out of a legitimate and reasonable need, in particular situations, for private people to be able freely to express private concerns to a limited and correlatively concerned audience, whether or not those concerns also touch upon the public interest in the broad sense." Bainhauer, supra, 215 N.J.Super. at 36, 520 A.2d 1154. This privilege is identified as the conditional special-interest privilege. Ibid.
"A communication `made bona fide upon any subject-matter in which the party communicating has an interest, or in reference to which he has a duty, is privileged if made to a person having a corresponding interest or duty, although it contains criminatory matter which, without this privilege, would be slanderous and actionable.'"
[Ibid. (quoting Coleman v. Newark Morning Ledger Co., 29 N.J. 357, 375, 149 A.2d 193 (1959)).]
The test of the existence of the occasional privilege is the "circumstantial justification for the publication of the defamatory information." Id. at 36-37, 520 A.2d 1154. "The critical elements of this test are the appropriateness of the occasion on which the defamatory information is published, the legitimacy of the interest thereby sought to be protected or promoted, and the pertinence of the receipt of that information by the recipient." Id. at 37, 520 A.2d 1154. The judge must make an "objective determination of whether the defamatory statement was on its face an apparently reasonable response to the circumstances." Id. at 41, 520 A.2d 1154.
The question of whether a defamatory statement is privileged is a threshold determination to be made by a judge rather than a jury. Lawrence v. Bauer Publ'g *725 & Printing Ltd., 89 N.J. 451, 462, 446 A.2d 469, cert. denied, 459 U.S. 999, 103 S.Ct. 358, 74 L.Ed.2d 395 (1982); Bainhauer, supra, 215 N.J.Super. at 40, 520 A.2d 1154. The judge determines "whether the occasion upon which the defendant published the defamatory matter gives rise to a privilege." Restatement (Second) of Torts § 619(1) (1977).
In Bainhauer, after a patient died in the recovery room, the patient's surgeon, Manoukian, informed the chief of the anesthesia service, Lutz, that he did not want Bainhauer, another anesthesiologist, to administer anesthesia to any of his patients because he "just killed my patient." 215 N.J.Super. at 17, 520 A.2d 1154. Later that day, in the hallway of the hospital, Manoukian allegedly told two other surgeons that Bainhauer was responsible for the death of his patient. The following day, Manoukian wrote a letter to Coyne, the Chairman of the Executive Committee of the hospital and president of the medical and dental staff, saying that he refused to have Bainhauer give anesthesia to his patients in the future. Manoukian wrote another letter to Coyne which detailed the immediate problem and referenced two other occasions when Manoukian believed that Bainhauer had been incompetent.
We held that the statements made by Manoukian came within the scope of the privilege. Id. at 37, 520 A.2d 1154. Lutz, as Bainhauer's superior, was an appropriate recipient of the information. Id. at 39, 520 A.2d 1154. The two surgeons in the hall were also proper recipients of the communication because "[a]ll [of] the surgeons had a community of interest in the performance of the hospital's three anesthesiologists. Hence, their patients' interest as well as their own professional interest justified the communication." Ibid. We reasoned:
Each physician within a hospital community has a significant and obvious interest in the professional qualification, skill and competence of every other health-care professional rendering services within that community and particularly those with whom he or she works directly. The welfare of patients, the reputation of the hospital, the physician's own ability properly to treat and protect patients and the physician's own professional reputation are all implicated. Moreover, the public relies on the professional judgments of the hospital community to assure it of the professional skill, qualification, and competence of the medical staff it provides and to take whatever steps are appropriate to that end. This is singularly so when hospital staff personnel are beyond the patient's choice. Although a patient may choose his surgeon, he does not typically choose his anesthesiologist any more than he chooses his nurse or lab technician. It is therefore not only the physician's self-interest but also the public's interest which demands that hospital staff physicians be free to express themselves openly and without fear of reprisal when matters directly affecting the quality of health care are involved. Indeed, we regard such expression as, at the least, a moral duty of each physician. In any event, we have no doubt that an individual physician's significant interest in his own reputation produces a lesser weight on the balance scale than the aggregate of the public and private interests served by encouraging physicians to speak out when, in their professional judgment, a colleague's skill and qualification are questionable.

[Id. at 37-38, 520 A.2d 1154.]
The judge here found that the "communication by the various nurses and personnel of the hospital" came "within the ambit of occasional or conditional privilege." He relied on Bainhauer and concluded that it was in the public's interest for hospital staff to be able to express themselves openly and without fear of reprisal when matters directly affecting the quality of health care are involved.
As Judge Little observed, and as we have noted, our reasoning in Bainhauer *726 concerning the responsibility and role of a physician within a hospital community applies with equal force to a nurse. The welfare of patients and the reputation of the hospital, physician and nurse are all part of the panoply of interests involved in the delivery of health care. Of some distinction is the observation, paraphrasing Bainhauer, that while patients can be selective in their choice of doctors, this is generally not the case with nurses. A patient will be treated or assisted by a nurse in the employ of the hospital with little if any input into the selection of that health care professional. The patient must rely exclusively on the reputation and concern of the hospital and attendant medical staff that the nursing staff will be well-trained, efficient and effective in its delivery of health care services. This is a short step removed from the care described in Bainhauer but clearly within the sphere of the public interest. We extend Bainhauer to apply to nurses and conclude that the defendants' comments were protected by the Bainhauer privilege as it applied to plaintiff.
The condition or occurrence of a special-interest privilege, however, is not absolute. A plaintiff may overcome this privilege by proving that the immunized defendant abused its privilege. Kass, supra, 291 N.J.Super. at 19, 676 A.2d 1099. A qualified privilege is abused if: "1) the publisher knows the statement is false or the publisher acts in reckless disregard of its truth or falsity; 2) the publication serves a purpose contrary to the interests of the qualified privilege; or 3) the statement is excessively published." Williams v. Bell Tel. Labs. Inc., 132 N.J. 109, 121, 623 A.2d 234 (1993) (citations omitted). The privilege will also be abused if the publisher "`does not reasonably believe the matter to be necessary to accomplish the purpose for which the privilege is given.' "Bainhauer, supra, 215 N.J.Super. at 43, 520 A.2d 1154 (quoting Restatement (Second) of Torts § 605 (1977)). To show an abuse of privilege, plaintiff need not show malice in fact through ill will or other improper motive. Kass, supra, 291 N.J.Super. at 22, 676 A.2d 1099. Abuse of a qualified privilege must be proven by clear and convincing evidence. Erickson v. Marsh & McLennan Co., 117 N.J. 539, 566-67, 569 A.2d 793 (1990); Kass, supra, 291 N.J.Super. at 23, 676 A.2d 1099. The jury determines whether the defendant abused a special-interest privilege. Bainhauer, supra, 215 N.J.Super. at 40-41, 520 A.2d 1154; Restatement (Second) of Torts § 619(2) (1977).
After determining the community of interests included within the scope of the privilege, Judge Little addressed the abuse of privilege and found that plaintiff did not show that the speaker either knew the matter was false or acted in reckless disregard of its falsity. He found that the nurses were "responding to plaintiff's reaction to the State's accusations. The speakers in this case acted for the purpose of protecting the interest of the protection of which the privilege is given, to wit, the health of the plaintiff, the reputation of the nursing profession and hospital and the welfare of patients in the hospital."
The judge then found that there was no proof to support a determination that defendants lost this privilege, concluding that plaintiff failed to show that defendants did not believe the publications were a proper means of communicating the defamatory matter. He found that plaintiff "participated in the publishing of the statement" because she insisted upon leaving noting that the communication between nurses was proper because they were members of the health provider field and members of the privileged group. He concluded that even if the State Board was wrong and the nurses were wrong, "they were still exercising their honest professional judgment in a manner consistent with the hospital's interest and the public's interest."
He then found that there was no "malice or ill will," nor any showing that the speakers disseminated the statements "for their own ill gain or just to defame another *727 person." The statements were disseminated pursuant to and in furtherance of the goals of the privilege.
The judge noted that the issue of abuse of privilege was a jury question, but he concluded that there was no dispute as to the facts, and thus, under the summary judgment standard, the question did not need to go to the jury.
Plaintiff contends that the statements made here fail to meet the "critical test" to invoke privilege because WJHS was under no duty to communicate the statements to anyone other than the supervisory staff at the hospital, and Recovery Network was under no duty to communicate the statements to anyone. This, she claims, distinguishes her case from Bainhauer, in which statements were communicated only to the persons who had the power to separate the anesthesiologist plaintiff from patient care. Plaintiff argues that statements about her were made by her supervisors and Recovery Network to subordinate nurses and third parties who had no power to protect the public from any threat by plaintiff, and thus, the communications were not privileged.
Plaintiff's attempt to distinguish Bainhauer on the basis that in that case, the communications were made only to Bainhauer's supervisors, is flawed. In Bainhauer, defendant had made statements to other surgeons who had no supervisory power over the plaintiff. The court found that the communication was privileged because "[a]ll the surgeons had a community of interest in the performance of the hospital's three anesthesiologists" and thus, "their patients' common interest as well as their own professional interest justified the communication." 215 N.J.Super. at 39, 520 A.2d 1154.
In Bainhauer, we cited Sokolay v. Edlin, 65 N.J.Super. 112, 167 A.2d 211 (App.Div.1961), in which we found "a sufficient common interest to sustain the privilege where co-employees were told that another employee was guilty of theft from the employer." 215 N.J.Super. at 39, 520 A.2d 1154. In Ramsdell v. Pennsylvania R.R. Co., 79 N.J.L. 379, 381, 75 A. 444 (Sup.Ct.1910), a notice was distributed to all train conductors stating that plaintiff was discharged for failure to issue meal checks according to instructions. Despite being libelous per se, the court held that the communication was privileged as to the employees of the dining car department because the employees should properly be informed of the severance of relations between the company and one of its conductors. Ibid. As we concluded in Bainhauer, the physician's interest in his or her reputation is outweighed by the public and private interests served by "encouraging physicians to speak out when, in their professional judgment, a colleague's skill and qualification are questionable." Bainhauer, supra, 215 N.J.Super. at 38, 520 A.2d 1154.
Plaintiff focuses on the "duty" aspect of the qualified privilege and argues that WJHS had no duty to communicate the statements concerning plaintiff's alleged drug use to anyone other than the supervisory staff at the hospital, and Recovery Network was under no duty to communicate the statements to anyone. Plaintiff's view is too narrow as the privilege not only applies when there is a "duty," but also when the party communicating the statement has "an interest." Sokolay and Ramsdell support the conclusion that plaintiff's nurse co-workers were appropriate recipients of the communication about plaintiff's professional ability and the extent to which that might be impaired.
Plaintiff argues that Recovery Network had no duty to communicate with anyone including Yheaulon. Recovery Network counters that the only statements that could be attributed to it were the privileged ones made by Oresic to plaintiff's husband because 1) it did not inform Yheaulon of the identity of the nurse at issue and she did not find out until the morning she arrived at the hospital, and 2) *728 Oresic did not say anything while the group was outside the hospital. Plaintiff does not argue that WJHS had no right to contact Recovery Network or that WJHS published slander to Recovery Network when it asked Oresic to participate in the intervention. We conclude that Recovery Network had the right to send whomever it deemed appropriate to participate in the intervention, including Yheaulon. While it is true that Yheaulon was not an employee of Recovery Network, she was, in effect, a volunteer for its service. Her additional status as an employee of WJHS places her squarely within the community of interest as both a participant in the intervention and a member of the hospital nursing staff. We conclude that any statements made to Yheaulon were privileged.
We reach a similar result as to Oresic's communication with plaintiff's husband, Michael Govito. The trial judge found that Oresic's conversation was "also privileged as [the] husband's interest was the same as ... Oresic's interests, the best interests of plaintiff."
The Restatement (Second) of Torts § 595 (1977) states:
(1) An occasion makes a publication conditionally privileged if the circumstances induce a correct or reasonable belief that
(a) there is information that affects a sufficiently important interest of the recipient or a third person, and
(b) the recipient is one to whom the publisher is under a legal duty to publish the defamatory matter or is a person to whom its publication is otherwise within the generally accepted standards of decent conduct.
(2) In determining whether a publication is within generally accepted standards of decent conduct it is an important factor that
(a) the publication is made in response to a request rather than volunteered by the publisher or
(b) a family or other relationship exists between the parties.
The judge did not analyze the issue in these terms because Recovery Network apparently did not raise this reason below; however, we now address the issue on this appeal. Cf. Chimes v. Oritani Motor Hotel, Inc., 195 N.J.Super. 435, 443, 480 A.2d 218 (App.Div.1984).
We conclude that the statements to Michael fall within the scope of § 595. The information that plaintiff was using drugs affected an important interest of the recipient, her husband. Advising a spouse of a serious problem of the other spouse could easily be considered "within the generally accepted standards of decent conduct." Michael, after Oresic's initial contact, called her back to seek more information, including what type of drug plaintiff was allegedly addicted to, and thus, the information Oresic gave him was in response to his question. Certainly, the purpose of advising Michael of plaintiff's condition was again in furtherance of both the goals of the privilege and the interests of plaintiff.
Plaintiff contends that WJHS lost its privilege because the investigation it conducted was reckless. She focuses on Floyd's testimony that Floyd simply flipped through the narcotics sheets, unsure of what she was looking for, thinking that someone else would conduct a proper investigation. Plaintiff asserts that, "Because West Jersey published the defamatory statements based upon such scant information, the privilege was lost." Plaintiff claims that Recovery Network published the defamatory statements based upon no information, and made no effort to determine whether the statements were true, so it, too, lost its privilege.
To overcome a qualified privilege on this ground, "a plaintiff must establish that the publisher knew the statement to be false or acted in reckless disregard of its truth or falsity." Dairy Stores, Inc. v. Sentinel Publ'g Co., 104 N.J. 125, 151, 516 *729 A.2d 220 (1986), citing Restatement (Second) of Torts, § 600 (1977). Comment b to § 600 explains that:
Reckless disregard as to truth or falsity exists when there is a high degree of awareness of probable falsity or serious doubt as to the truth of the statement. The standard here is the same whether liability will be imposed for a defamatory communication about a public official or a public figure.
The United States Supreme Court defined "reckless disregard" as the publishing of defamatory statements with a "high degree of awareness of their probable falsity." Garrison v. Louisiana, 379 U.S. 64, 74, 85 S.Ct. 209, 216, 13 L.Ed.2d 125, 133 (1964). In St. Amant v. Thompson, 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262, 267 (1968), the Supreme Court stated:
[R]eckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication. Publishing with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice.
"Neither `errors of interpretation of judgment' nor `misconceptions' are sufficient to create a jury issue." Lawrence v. Bauer Publ'g & Printing Ltd., supra, 89 N.J. at 468, 446 A.2d 469. Although the term "actual malice" has been used to express this standard, it has nothing to do with hostility or "ill will." Ibid. Thus, the judge was wrong here to equate "bad motive" or "ill will" with the "actual malice" standard. However, that error had no practical effect on the decision and was harmless.
Plaintiff argues that WJHS based its accusations on "scant" evidence turned up in the investigation and argues that Recovery Network had an obligation to investigate the truth of the statements it made. However, there is no duty to investigate. St. Amant, supra, 390 U.S. at 731, 88 S.Ct. at 1325, 20 L.Ed.2d at 267. The standard is whether the speakers published while entertaining serious doubts about the statement's truth. Plaintiff presented absolutely no evidence that Recovery Network had any reason to believe the statements were false.
The unrefuted proofs belie any claim of reckless disregard. Defendants, as set forth in their briefs, were confronted with the following information developed by the State investigators regarding plaintiff and her conduct with morphine.
(1) 37% of all narcotics signed out by the nurses working in the ICU from April through October 1993 was signed out by plaintiff.
(2) On over 100 occasions, plaintiff signed out narcotics with no record that they were ever given to patients.
(3) A "red flag" for narcotics diversion by a nurse is a pattern of consistently signing out narcotics immediately upon starting a shift. When the State investigators interviewed plaintiff on November 3, she was unable to explain why she was consistently signing out narcotics within 15-30 minutes of coming on shift, except to say she administered medications after her initial assessment. This finding occurred with only plaintiff. Other nurses with the same patients did not follow this pattern.
(4) The double dose sign-out of narcotics for a patient who was not ordered to get morphine was an indication that something was seriously wrong.
After their first review of the narcotics sign-out sheets, patient records and the interview with plaintiff on November 3, the State investigators reviewed even more records and narcotics sheets from January, May, June and July, 1993. More evidence of discrepancies by plaintiff were discovered. *730 However, the State investigators found no indication of diversion or improper nursing practice by any other nurse on any shift working on ICU and PCU. A fair consideration of these facts supports the judge's finding that no jury question existed as to reckless disregard of the truth or falsity of the statements made.
Plaintiff also claims that the defamatory statements were excessively published by WJHS when statements were made about plaintiff in front of a secretary and passers-by on the street. Plaintiff makes no claim that Recovery Network excessively published the statements.
A privilege is abused unless the speaker "reasonably believes that the publication is a proper means of communicating the defamatory matter to the person to whom its publication is privileged." Restatement (Second) of Torts § 604 (1977). Comment a to this section explains this principle more fully:
Ordinarily, a privilege is abused by speaking defamatory words in the presence of persons whose knowledge of them is unnecessary to the protection of the interest in question. However, this is not true when the publication to those persons is reasonably incidental to the communication of the defamatory matter to the person whose knowledge is reasonably believed to be necessary or useful for the protection of the interest. In many cases, the communication, to be effective, must be made at a given time and place even though third persons are present who are likely to overhear it. In other cases, the difficulty of strictly private communication may be so great as to make it proper to speak when a third person is present. On the other hand, if the speaker unnecessarily publishes a slander to third persons to whom he is not privileged to publish it, the fact that by so doing he communicates the defamatory matter to a person to whom he is privileged to publish it does not prevent his conduct from being an abuse of the privilege.
Plaintiff noted that while in the hospital, she was accused of being a drug user and diverter in front of a secretary, and while outside of the hospital, she was accused of the same while bystanders were present. According to plaintiff, these people had no interest in the situation, and no right to know of the allegations against plaintiff.
The "intervention" process described in the record moved from the investigator's confrontation of plaintiff in a conference room to the awaiting "interventionists" in the hallway. Included in their number was a secretary. It is the secretary's presence which gives rise to this claim of overpublication. Considering the fluid and dynamic nature of the described intervention process combined with plaintiff's voluntary movement from the conference room to the hallway, and then to the parking lot, we conclude that Judge Little did not err in finding no jury issue as to abuse of the privilege. We suggest that the secretary's presence was so tangential to this "moving" intervention process, that a reasonably prudent finder of fact could not conclude that comments in her presence were an abuse of the privilege. See Brill v. Guardian Life Ins. Co., 142 N.J. 520, 540, 666 A.2d 146 (1995). We reach the same result with respect to these unidentified persons who "may" have overheard comments in the parking lot. Plaintiff brought the process to the parking lot; moreover, there was a failure of proof as to whether anyone actually heard the defamatory comments while in the parking lot.
Plaintiff next claims that the privilege was abused because "none of the publications made by defendants were to protect the public interest." She continues, "[p]ublication to lower-level employees of the hospital and to third parties cannot in any way protect the public interest."
We reject such argument and reiterate our view regarding the public's interest in capable, drug-free nurses. We conclude *731 that there was not sufficient evidence to submit this issue to the jury.
Lastly, plaintiff argues that because negligent infliction of emotional distress is an independent tort, the judge erred in dismissing this claim. Recovery Network argues that this claim is simply a recasting of her defamation claim. WJHS asserts that plaintiff had to prove that defendants acted with actual malice when the defamatory statements were uttered, and because she cannot, she cannot maintain a claim for negligent infliction of emotional distress. (We note that plaintiff does not contest the dismissal of her intentional infliction of emotional distress claim.)
The judge dismissed plaintiff's claim against WJHS because "[i]n order to have... negligent infliction of emotional distress you must have an actionable tort and plaintiff has not proven an actionable ... tort. The defendant's actions were privileged and done pursuant to a duty imposed by law." He said the "same thing applies" to Recovery Network.
In Decker v. Princeton Packet Inc., 116 N.J. 418, 429, 561 A.2d 1122 (1989), the Supreme Court explained:
The tort involving the negligent infliction of emotional distress can be understood as negligent conduct that is the proximate cause of emotional distress in a person to whom the actor owes a legal duty to exercise reasonable care. Thus, to establish liability for such a tort, a plaintiff must prove that defendant's conduct was negligent and proximately caused plaintiff's injuries. The negligence of defendant, however, depends on whether defendant owes a duty of care to the plaintiff, which is analyzed in terms of foreseeability. "[L]iability should depend on the defendant's foreseeing fright or shock severe enough to cause substantial injury in a person normally constituted."
[Ibid. (citation omitted) (quoting Caputzal v. Lindsay Co., 48 N.J. 69, 76, 222 A.2d 513 (1966)).]
"[R]ecovery for negligent infliction of emotional harm requires that it must be reasonably foreseeable that the tortious conduct will cause genuine and substantial emotional distress or mental harm to average persons." Id. at 430, 561 A.2d 1122.
WJHS is correct that the judge erred in finding that an underlying tort must be present to support a claim for infliction of emotional distress. Hume v. Bayer, 178 N.J.Super. 310, 317, 428 A.2d 966 (Law Div.1981). However, a judgment will be affirmed on appeal if it is correct, even if the judge provided the wrong reasons for the decision. See, e.g., Gerber v. Springfield Bd. of Educ., 328 N.J.Super. 24, 40, 744 A.2d 670 (App.Div.2000). The judge's ultimate ruling was correct since there is another reason for sustaining the judge's dismissal of plaintiff's claim for negligent infliction of emotional distress: plaintiff cannot meet the level of intent necessary to recover.
Several federal courts have addressed the standard of conduct necessary to trigger liability for negligent infliction of emotional harm by a [media] defendant also being sued for defamation. They have found that the first amendment requires that plaintiff establish at least the same level of intent to recover for the infliction of emotional harm as is necessary to find defamation. If the levels of culpability were not at least as stringent, plaintiffs would be able to use the tort of negligent infliction of emotional distress to overcome defenses to defamation actions, to avoid short statutes of limitations for defamation, and to circumvent judicial barriers to punitive damages. There is, in other words, a certain symmetry or parallel between claims of emotional distress and defamation that calls for consistent results.
[Decker, supra, 116 N.J. at 432, 561 A.2d 1122 (citations omitted).]
Although Decker addresses "media defendants," the same standard of proof applies to "public interest" figures such as plaintiff. Moreover, the same policy *732 considerations expressed in Decker are applicable here. If the level of culpability were not at least as stringent, plaintiff would be able to use negligent infliction of emotional distress to circumvent the privilege defense to defamation.
As we have previously noted, plaintiff here was unable to meet the stringent standard required to demonstrate that defendants acted with reckless disregard as to the truth or falsity of their statements. She is likewise unable to sustain a claim of negligent infliction of emotional distress.
We affirm the judge's dismissal of plaintiff's claims against both defendants.