**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3157-19

SHAWNA MORGAN,

    Plaintiff-Respondent,

v.

WILLIE MAXWELL II, a/k/a
"FETTY WAP," FETTY WAP
TOURING INC.,

    Defendants,

and

GOODFELLA4LIFE ENT.,
d/b/a RGF PRODUCTIONS,
INC.,[1]

    Defendant-Appellant.

_____

Submitted February 24, 2021 – Decided April 26, 2021

Before Judges Ostrer, Vernoia, and Enright.

On appeal from the Superior Court of New Jersey, Law Division, Bergen County, Docket No. L-5834-17.

_____

[1] Sued herein as RGF Productions, Inc. d/b/a Goodfella4life Ent.

Cariddi & Garcia, attorneys for appellant (Anthony J. Cariddi, on the briefs).

Hillel I. Parness, attorney for respondent.

PER CURIAM

Goodfella4life Ent., d/b/a RGF Productions, Inc. (RGF) appeals from the February 26, 2020 judgment entered in favor of plaintiff Shawna Morgan in the sum of $1,167,065.63, representing an award of $980,000 for RGF's alleged defamation of plaintiff, breach of contract damages totaling $66,294.42, and pre-judgment interest in the sum of $120,771.21. In the underlying action, defendants Willie Maxwell, II, a/k/a "Fetty Wap," a musical artist, and Fetty Wap Touring, Inc. (FWTI), a touring company, settled with plaintiff prior to trial and are not involved in this appeal.[2] We affirm the jury verdict on liability, vacate the damage award, and remand the matter for a new trial on damages.

We glean the following facts based on evidence produced during the five-day jury trial. In June 2014, plaintiff became an administrative assistant for Fetty Wap, FWTI, and RGF, a record label. Her duties included answering emails and phones, as well as booking tours and shows for Fetty Wap, although

_____

[2] Fetty Wap and FWTI collectively agreed to pay $140,000 to settle plaintiff's claims against them.

A-3157-19

plaintiff did not have a written employment agreement and was not a licensed booking agent.

According to Frank Robinson, RGF's co-owner, plaintiff was initially hired to assist him in answering phone calls and emails for RGF. Over time, plaintiff's duties at RGF expanded. She began to handle "all the day-to-day operations for the company," was "a liaison [for the publicists]," and traveled with the team on performance dates. Eventually, Fetty Wap and Robinson referred to plaintiff as the manager.[3]

At times, plaintiff used her personal American Express (Amex) card for business-related travel, accommodations, and other expenses. Robinson agreed to reimburse her for such expenses. According to plaintiff, Robinson also initially agreed to pay her a ten percent commission on any shows she booked for Fetty Wap. After RGF partnered with ICM booking agency, Robinson reduced plaintiff's commission rate to five percent. In October 2016, Robinson informed plaintiff he intended to change plaintiff's pay structure again, so she would receive a flat fee of $2500 per show.

---

[3] During trial, plaintiff produced an Instagram photo picturing her with Fetty Wap and the caption read: "The best manager I could ask for."

A-3157-19

Plaintiff testified that starting in late 2016 and continuing into 2017, her reimbursements and commission payments ceased. She was terminated from RGF in April 2017, and from April to August 2017, she attempted to collect her unreimbursed expenses and unpaid commissions from RGF and Fetty Wap.

On August 6, 2017, Thirty Mile Zone (TMZ), a popular entertainment gossip website, published an article entitled, in part, "Fetty Wap Fires Assistant for Allegedly Stealing $250K." The article stated:

> [s]ources close to Fetty's RGF Productions tell TMZ they fired Shawna Morgan Friday for falsely representing herself as his booking agent and manager. RGF claims Morgan charged additional fees to venues that booked Fetty. They believe she collected real booking fees on behalf of RGF and then e-mailed on the side pretending to be Fetty's manager. They claim she would request added fees, or as they say in the biz, double-dip. RGF also believes she took off top by lying about fees and pocketing the extra dough.

Two days later, RGF published a press release on www.rapfest.com, reflecting the following statement:

> Shawna Morgan is not a licensed booking agent. Here at RGF Production she was to perform strictly in an administrative capacity as an assistant to the booking team. However, she falsely represented herself as the booking agent and charged outside fees for her services. As a result, she received two fees, one directly from RGF, as well as a fee directly from the clients, an activity known as double-dipping.

4

Miss Morgan repeatedly undermined the chain of command by withholding information to the decision-makers within the firm, fraudulently misrepresenting herself as upper management. Miss Morgan was able to acquire additional business for personal gain.

As such, we would like to offer our sincerest apologies . . . Shawna, Sha Morgan, performing in a capacity that was in direct violation of both law and best business practices, misrepresented her position to our trusted business relationships.

On August 28, 2017, plaintiff sued RGF, Fetty Wap and FWTI. She sought liquidated damages in the sum of $66,294.42, representing compensation for work performed and reimbursement for expenses. Additionally, she requested unspecified damages for defamation. She did not seek punitive damages in her complaint.

On December 2, 2019, the parties appeared for trial. That same day, plaintiff settled with Fetty Wap and FWTI, but RGF, through Robinson, withdrew its settlement offer, discharged its counsel and confirmed it wished to proceed to trial. The trial was rescheduled to February 10, 2020, at which time successor counsel appeared.

During the trial, plaintiff testified about her payment structure at RGF, how Robinson initially instructed her to charge a ten percent commission, or "booking fee on top" of the fee set forth in a performance contract. She also

5

recalled Robinson was aware promoters would pay her commission fee directly into her Wells Fargo account, and confirmed Robinson "was the one that said . . . when you're going to book the show, put your fee on top . . . . Those were his . . . words." Additionally, plaintiff affirmed that in other instances, she received a five percent commission on "the total show." Sometime in 2016, another change was made to her pay arrangement, and she testified RGF informed her she would receive a flat fee of $2500 per show.

Further, plaintiff testified there came a point in time when she started "advancing expenses on behalf of others" at RGF because "neither Fetty nor Frank Robinson nor his partner . . . had credit of any sort." She specified Robinson asked her to put business-related charges on her Amex card. Further, she explained

> it was easier for this group and the team to move around and be able to do a lot of things, because . . . I had my Amex card . . . and I was asked to . . . put the charges, the travel or whatever the case was, on my card, and I was reassured that I would be reimbursed before . . . the bill was due, so I could . . . pay my bill.

Fetty Wap's attorney, Navarro Gray, testified he tried to assist plaintiff in recovering business-related expenses arising from her employment with RGF. However, he was informed by Fetty Wap that plaintiff was "overpaid previously." Moreover, Gray testified that following plaintiff's termination,

6

"everybody started looking into things," and they "came up with the conclusion that Ms. Morgan was taking commissions from bookings and then also getting paid a commission from the Fetty Wap Touring account." Asked on direct examination if "anyone ever show[ed him] proof of double dipping at that time," Gray answered, "[a]t that time, no."

In support of her defamation claim, plaintiff introduced the deposition testimony of Fetty Wap and Karen Civil, an entertainment and marketing professional and one of the founders of the Marathon Agency. According to Fetty Wap's deposition testimony, the TMZ article "was posted through RGF" and to his knowledge, "RGF gave the information to TMZ." When Civil was deposed, she testified that before the TMZ article was published, Marathon Agency wanted "to form a business relationship with" plaintiff. Civil retracted her offer to work with plaintiff after she learned plaintiff "had been publicly accused of theft and other wrongdoing by artist Fetty Wap."

Robinson testified about plaintiff's involvement with RGF and what led to her being fired. Robinson recalled plaintiff negotiated a booking for a show called "Shaggfest." According to his testimony, after plaintiff was terminated from RGF, he learned from FWTI's tour manager that plaintiff told a Shaggfest representative there would be additional fees for Fetty Wap's participation in the

show. At that point, Robinson concluded even though plaintiff was on "salary," she had "reach[ed] behind" and had "ask[ed] for a commission after [he] discussed with . . . [her] there is no more commissions, . . . she's going to salary." On cross-examination, when asked whether Robinson had "any document" to prove plaintiff told Shaggfest, "you cannot put on this show unless I get my commission," he answered "No, I do not have a document saying that."

Robinson also testified that before plaintiff was fired in April 2017, plaintiff and Fetty Wap argued over fees to be charged for another show. Fetty Wap instructed Robinson and his friend, "Big Worm," to tell plaintiff "to put that on the calendar" and the fee for the show would be $30,000. However, Fetty Wap later discovered plaintiff told Big Worm that RGF wanted a fee of $45,000. Robinson testified when Fetty Wap learned of this discrepancy in fees, plaintiff "and Fetty, they got into it, and he said she [is] fired . . . . So [Robinson] released her."

Regarding the TMZ article released after plaintiff's termination, Robinson denied authorizing anyone at RGF to speak with TMZ about plaintiff, and he stated he did not speak to TMZ before the August 6, 2017 article was published. But on cross-examination, he acknowledged RGF issued the August 8, 2017 press release. Robinson further conceded he had someone else type up the press

release while he "stood right there," and then he approved it for dissemination over the internet. Robinson testified, "[a]ll I know is it got sent out and it got ate up by the Internet and it went everywhere."

At the conclusion of the trial, plaintiff's counsel informed jurors during his summation:

> you are allowed to award compensatory damage for emotional suffering. In addition to actual damages, you can award emotional damages as compensation.
>
> . . . .
>
> You're empowered to award Ms. Morgan damages for emotional suffering and <u>I implore you to think about how you would feel in her position and to be generous in assigning a dollar value to that pain and suffering. If it's easier, think about how you would feel if it happened to someone that you care about. Think about someone that you care about and put them in Ms. Morgan's position and think about what it would take to bring that person back.</u>
>
> . . . .
>
> Finally, we get to punitive damages . . . . Punitive damages are awarded . . . as the name implies, to punish the wrongdoer for particularly malicious and bad behavior. We have shown such malicious and bad behavior here.
>
> . . . .
>
> For whatever reason, RGF and Frank Robinson wanted to destroy Shawna Morgan. RGF acted with

intense malice and, under the circumstances, you can award punitive damages as you see fit. You have significant discretion and a big responsibility. If you believe that punitive damages are in order, you should think about what dollar figure it would take to deter RGF and people like Mr. Robinson from acting this way in the future.

It's been our suggestion from the start that some multiple of $250,000, the amount she was accused of stealing, is a very good place to start. I ask you to put yourselves again in Ms. Morgan's shoes and think about what dollar amount would be an appropriate punishment for someone who has done something like this to you or to someone you care about.

[Emphasis added.]

Once plaintiff's counsel finished his summation, defendant's attorney promptly moved for a mistrial. He argued plaintiff's attorney violated the "golden rule doctrine" by asking jurors to "put [them]selves . . . in Ms. Morgan's shoes." In response to defendant's application, the court succinctly stated without explanation, "[m]otion is denied."

We note defendant raised no objection to plaintiff's opening or closing remarks insofar as they referenced plaintiff's entitlement to punitive damages. Nevertheless, the judge eliminated all instructions proposed by plaintiff's counsel regarding the various types of damages a jury could award. Additionally, the judge made no mention of punitive damages when he charged

the jury. Instead, when he instructed the jury about damages, the judge stated, in part:

> The plaintiff must prove that the damages were the natural and probable consequences of the defendant's breach and/or defamation. Damages may not be based on conjecture or speculation.
>
> I charge you, ladies and gentlemen, that the argument of counsel with references to calculation of damages on a time-unit basis is argument only and is not to be considered by you as evidence. Counsel's statements are a suggestion to you as to how you might determine damages, breach, and/or defamation. You are free to accept or reject this argument as you deem appropriate.
>
> I remind you that you are to make a determination on the amount of damages based on evidence presented and the instructions I have given you on damages.
>
> . . . .
>
> Your oath as jurors requires you to decide this case fairly and impartially, without sympathy, passion, bias or prejudice. You are to decide this case based solely upon the evidence that you find believable and in accordance with the rules of law that I give you.

After deliberating, the jurors completed a verdict sheet confirming they found: (1) a contract existed between plaintiff and RGF; (2) the contract provided for reimbursement fees and compensation for work performed by the plaintiff; (3) RGF breached the parties' contract; (4) plaintiff was entitled to

11

breach of contract damages in the sum of $66,294.42; (5) defendant defamed

plaintiff; (6) plaintiff was entitled to defamation damages of $980,000; and (7)

plaintiff was entitled to injunctive relief.

On appeal, defendant raises the following argument for our consideration:

POINT I

TRIAL COURT ERRED BY FAILING TO GRANT DEFENSE MOTION FOR MISTRIAL BASED UPON PLAINTIFF'S COUNSEL'S COMMENTS [ ] MADE DURING SUMMATION WHICH EXCEEDED THE BOUNDS OF PERMISSIBLE ADVOCACY AND WERE PREJUDICIALLY IMPROPER THEREBY CONSTITUTING A "MISCARRIAGE OF JUSTICE." R. 2:10-1; R. 4:49-1(a). THIS COURT MUST REMAND FOR BOTH LIABILITY AND DAMAGES. OBJECTION APPEARS ON THE RECORD[.]

Defendant contends that plaintiff's counsel improperly: (1) invoked the

golden rule and asked jurors to consider damages "as if they were in the

plaintiff's position"; (2) requested punitive damages; and (3) asked the jury to

"send a message" in calculating an award for the plaintiff.

Plaintiff urges us not to consider defendant's two latter issues, claiming

RGF's "failure to disclose that two out of three issues were not raised below"

constitutes a violation of Rule 2:6-2(a)(6).[4]

---

[4] Rule 2:6-2(a)(6) states in relevant part:

As a threshold matter, we note that the purpose of an appellate brief is to provide the court "an orderly and considered presentation of the matter on appeal so that the court 'may have before it such parts of the record and such legal authorities as will be of help in arriving at a proper determination.'" Hayling v. Hayling, 197 N.J. Super. 484, 488-89 (App. Div. 1984) (quoting Abel v. Elizabeth Bd. of Works, 63 N.J. Super. 500, 509 (App. Div. 1960)). It is the responsibility of the parties to provide the court with their arguments, the legal authority to support them and then to cite to the portions of the record in support. See Spinks v. Twp. of Clinton, 402 N.J. Super. 465, 474 (App. Div. 2008). To the extent defendant failed to comply with Rule 2:6-2(a)(6), we overlook this procedural deficiency, in part, and address the merits of

---

(a) . . . Except as otherwise provided . . . the brief of the appellant shall contain the following material, . . . arranged in the following order:

. . . .

(6) The legal argument for the appellant, which shall be divided, under appropriate point headings, distinctively printed or typed, into as many parts as there are points to be argued. For every point, the appellant shall include in parentheses at the end of the point heading the place in the record where the opinion or ruling is located or if the issue was not raised below a statement indicating that the issue was not raised below.

13

defendant's appeal, because: (1) defendant's argument is framed in general terms to encompass the issues it raises; (2) the issue of punitive damages needs to be addressed by virtue of plaintiff's failure to seek punitive damages in her complaint; and (3) the issue of punitive damages further was implicated when the trial court eliminated any reference to such damages in its jury charge.

Additionally, we conclude we need not discuss at length the issue of whether plaintiff's counsel indirectly asked jurors to "send a message" to defendant, as we are constrained to vacate the damage award on other grounds. Suffice it to say, even if plaintiff's counsel did not expressly implore the jury to "send a message," the tone of his summation advanced the same message. In that regard, we remind the parties that "the use of the 'sending a message' argument is inappropriate in a civil case where the only issue is compensatory damages." Jackowitz v. Lang, 408 N.J. Super. 495, 509 (App. Div. 2009).

We begin our review of RGF's argument with the understanding counsel has "broad latitude" to make closing arguments to the jury. Diakamopoulos v. Monmouth Med. Ctr., 312 N.J. Super. 20, 32 (App. Div. 1998). But it is "improper to construct a summation that appeals to the emotions and sympathy of the jury." State v. Black, 380 N.J. Super. 581, 594 (App. Div. 2005). Here, RGF contends plaintiff's counsel attempted to elicit sympathy from the jury by

14

invoking the golden rule during his summation, asking jurors to put themselves in plaintiff's shoes, rather than neutrally assess the issues in the case. We agree.

The golden rule is based on the principle that "you should do unto others as you would wish them to do unto you." Geler v. Akawie, 358 N.J. Super. 437, 464 (App. Div. 2003). It is improper for an attorney to invoke this rule because it tends to encourage "the jury to depart from neutrality and to decide the case on the basis of personal interest and bias rather than on the evidence." Id. at 464-65 (quoting Spray-Rite Serv. Corp. v. Monsanto Co., 684 F.2d 1226, 1246 (7th Cir. 1982), aff'd on other grounds, 465 U.S. 752 (1984)). A golden rule argument suggests to jurors that they should "adopt what they would want as compensation for injury, pain and suffering." Id. at 464.

Governed by these principles, we are satisfied plaintiff's counsel improperly referenced the golden rule during summation. First, he told jurors, "[y]ou're empowered to award Ms. Morgan damages for emotional suffering and I implore you to think about how you would feel in her position and to be generous in assigning a dollar value to that pain and suffering." He added, "[i]f it's easier, think about how you would feel if it happened to someone that you care about. Think about someone that you care about and put them in Ms. Morgan's position and think about what it would take to bring that person back."

15

Moreover, he stated, "I ask you to put yourselves again in Ms. Morgan's shoes and think about what dollar amount would be an appropriate punishment for someone who has done something like this to you or to someone you care about."

RGF's counsel promptly objected to these improper comments at the conclusion of plaintiff's summation. Nonetheless, the trial court not only summarily denied defendant's motion for a mistrial, but failed to give jurors a curative instruction. We are convinced the invocation of the golden rule by plaintiff's counsel warranted the judge providing a clear, cautionary instruction to mitigate the prejudicial effect on the jurors, notwithstanding the failure of defendant's counsel to seek such an instruction. See Paxton v. Misiuk, 54 N.J. Super. 15, 24 (App. Div. 1959) ("The court is bound to make . . . corrective instructions to the jury so clear, explicit, and emphatic as to efface, if possible, any prejudicial or injurious influence likely to have resulted from the misconduct of counsel."). Since the trial judge directed jurors to deliberate free from bias and sympathy but gave no explicit curative instruction to ameliorate counsel's repeated references to the golden rule, we cannot conclude the jury's award of damages did not flow from plaintiff's prejudicial appeal. Thus, we reverse the award and remand for a new trial on damages.

16

Regarding the issue of punitive damages, we are mindful a punitive damage award is governed by the statutory provisions of the Punitive Damages Act (Act), N.J.S.A. 2A:15-5.9 to -5.17.  We also note "punitive or exemplary damages may be awarded in a defamation case," but "all elements of the . . . Act must be satisfied in order to sustain a punitive damages award."  W.J.A. v. D.A., 210 N.J. 229, 241 (2012).  Further, "the Act does not permit counsel to urge the jury to increase a punitive damage award in order to enhance the general deterrence of others."  Tarr v. Bob Ciasulli's Mack Auto Mall, Inc., 390 N.J. Super. 557, 569 (App. Div. 2007).

The Act provides, in part:

> a. Punitive damages may be awarded to the plaintiff only if the plaintiff proves, by clear and convincing evidence, that the harm suffered was the result of the defendant's acts or omissions, and such acts or omissions were actuated by actual malice or accompanied by a wanton and willful disregard of persons who foreseeably might be harmed by those acts or omissions. This burden of proof may not be satisfied by proof of any degree of negligence including gross negligence.
>
> b. In determining whether punitive damages are to be awarded, the trier of fact shall consider all relevant evidence, including but not limited to, the following:
>
> (1) The likelihood, at the relevant time, that serious harm would arise from the defendant's conduct;

A-3157-19

(2) The defendant's awareness of reckless disregard of the likelihood that the serious harm at issue would arise from the defendant's conduct;

(3) The conduct of the defendant upon learning that its initial conduct would likely cause harm; and

(4) The duration of the conduct or any concealment of it by the defendant.

[N.J.S.A. 2A:15-5.12.]

Importantly, "[a]n award of punitive damages must be specifically prayed for in the complaint." N.J.S.A. 2A:15-5.11. Here, plaintiff did not seek punitive damages in her complaint. Thus, the jury would not have been authorized to award same, irrespective of whether RGF's counsel objected to his adversary's entreaties for punitive damages during the proceedings. See In re Est. of Stockdale, 196 N.J. 275, 308 (2008); see also Depalma v. Building Inspection Underwriters, 350 N.J. Super. 195, 223-24 (2002). However, because the verdict sheet did not specify the type of damages the jury could award to plaintiff, the judge did not instruct the jury to disregard comments made by plaintiff's counsel regarding punitive damages, nor instruct jurors they were prohibited from awarding punitive damages, we have no confidence that repeated requests for punitive damages from plaintiff's counsel had no effect on the jury's decision to award damages. Thus, the award cannot stand.

Finally, RGF argues the trial court erred when denying its motion for a new trial. This argument is not persuasive.

We will not reverse a trial court's decision to deny a motion for a new trial "unless it clearly appears that there was a miscarriage of justice under the law." R. 2:10-1. "That inquiry requires employing a standard of review substantially similar to that used at the trial level, except that the appellate court must afford 'due deference' to the trial court's 'feel of the case,' with regard to the assessment of intangibles, such as witness credibility." Jastram v. Kruse, 197 N.J. 216, 230 (2008) (quoting Feldman v. Lederle Labs., 97 N.J. 429, 463 (1984)); see also Carrino v. Novotny, 78 N.J. 355, 360 (1979).

A jury's "verdict is entitled to considerable deference and 'should not be overthrown except upon the basis of a carefully reasoned and factually supported (and articulated) determination, after canvassing the record and weighing the evidence, that the continued viability of the judgment would constitute a manifest denial of justice.'" Hayes v. Delamotte, 231 N.J. 373, 385-86 (quoting Risko v. Thompson Muller Auto. Grp., Inc., 206 N.J. 506 (2011)).

"To promote economy in the administration of justice, we . . . endeavor to avoid a retrial that would further burden the party most aggrieved . . . . A more surgically crafted form of relief may . . . fairly and efficiently resolv[e] the

19

particular dispute." Goldfarb v. Solimine, 460 N.J. Super. 22, 35-36 (App. Div. 2019), aff'd as modified, 245 N.J. 326 (2021). Governed by these standards, we decline to conclude the trial court erred when denying RGF's request for a mistrial. Moreover, we are satisfied that when canvassing the record, there was sufficient evidence to support the jury's liability verdict.

To establish a claim the terms of a contract were violated, a plaintiff must prove four elements:

> first, that the parties entered into a contract containing certain terms; second, that [the] plaintiff did what the contract required [the plaintiff] to do; third, that [the] defendant did not do what the contract required [the defendant] to do, defined as a breach of the contract; and fourth, that [the] defendant's breach, or failure to do what the contract required, caused a loss to the plaintiff.
>
> [Woytas v. Greenwood Tree Experts, Inc., 237 N.J. 501, 512 (2019) (quoting Globe Motor v. Igdalev, 225 N.J. 469, 482 (2016)).]

Additionally, to establish a prima facie case of defamation, a plaintiff must establish the defendant (1) made a defamatory statement (2) concerning the plaintiff, (3) which was false, (4) was publicized to a third party, and (5) caused damages to plaintiff. Govito v. W. Jersey Health Sys., Inc., 332 N.J. Super. 293, 305-06 (App. Div. 2000). A defamatory statement is one that is (1) false and injures another person's reputation, or (2) subjects a person to hatred,

20                                                                                          A-3157-19

contempt or ridicule, or (3) causes others to lose good will or confidence in that person. Romaine v. Kallinger, 109 N.J. 282, 289 (1988).

Here, there was ample competent evidence to support the jury's findings that RGF was liable for its breach of contract and its efforts to defame the plaintiff. Not only did plaintiff's testimony support the liability verdict regarding RGF's breach of contract, but the deposition testimony of Karen Civil and Fetty Wap, as well as Robinson's own testimony, supported the liability verdict for defamation. For example, Civil testified she was planning to work with plaintiff, hoping to pay plaintiff a commission of between ten and twenty percent for her work with two of her agency's clients, but after RGF's August 8, 2017 press release issued, she informed plaintiff they would be unable to work together. Similarly, the deposition testimony of Fetty Wap made clear RGF was the source of the information given to TMZ for its August 6, 2017 article. Accordingly, although the closing remarks of plaintiff's counsel came close to encouraging the jury to decide liability issues for personal reasons, we are not convinced counsel's comments were so prejudicial as to necessitate a mistrial.

To summarize, we affirm the jury's verdict as to liability, vacate the judgment on damages, and remand this matter for a new trial on damages. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

21

A-3157-19