715 A.2d 999

CHARLES J. HILL, PLAINTIFF–APPELLANT, v. EVENING NEWS COMPANY, D/B/A BRIDGETON EVENING NEWS, JOHN M. EWING, JACK HUMMEL, KAY RUDDEROW, AND GARY MILLER, DEFENDANTS–RESPONDENTS.

Superior Court of New Jersey
Appellate Division

Argued March 11, 1998—Decided August 26, 1998.

548

Before Judges KING, MUIR, Jr., and CUFF.

*Daniel A. Zehner*, argued the cause for appellant.

*John E. Jesperson*, argued the cause for respondents (Ritter and Jesperson, attorneys; *Mr. Jesperson*, on the brief).

The opinion of the court was delivered by

CUFF, J.A.D.

In this appeal, we must determine whether a person found guilty by a jury of aggravated assault stemming from an alterca-

tion in which the victim died was defamed by a local newspaper when its report of his sentence recited he had been found guilty of aggravated manslaughter. On cross motions for summary judgment, the motion judge granted the newspaper's motion and dismissed the complaint because the article was not defamatory.

The facts are not in dispute. On December 22, 1992, an altercation occurred between plaintiff Charles J. Hill and Charles Bryant in the Seabrook Homes section of Bridgeton, Cumberland County. As a result of the fight, Bryant sustained eight knife wounds. He died from a stab wound to the chest. Hill also wounded the victim's sister, Annie Mae Burton, in the fight. Hill was indicted on five counts: first degree murder of Bryant, second degree aggravated assault of Burton, third degree aggravated assault of Burton, third degree hindering apprehension, and fourth degree tampering with physical evidence.

According to the sentencing transcript, Bryant was the aggressor by assaulting Hill with a knife. During the struggle, Hill took the knife away from Bryant and stabbed him. Hill denied that he inflicted the fatal wound. He testified that the fatal wound occurred when Bryant fell on the knife while the two men struggled. A jury convicted Hill solely of aggravated assault against Bryant. The jury acquitted Hill of murder, passion-provocation manslaughter, aggravated manslaughter, reckless manslaughter, hindering apprehension, and tampering with evidence. The trial judge dismissed the charge of aggravated assault against Burton. Hill was sentenced to a three-year term of imprisonment.

*The Bridgeton Evening News* (*The News*) covered Bryant's death and Hill's arrest, indictment and trial. *The News* has a circulation of approximately 10,000 and is published daily, except Sunday.

Hill does not dispute the accuracy of any of the stories published by *The News* concerning his trial and conviction. He alleges, however, that the paper's December 4, 1993 report of his sentencing falsely reported that he had been convicted of aggravated

manslaughter rather than aggravated assault. The pertinent part of the disputed article is as follows:

*Judge lowers Seabrook **killing** to 3rd-degree*

Cumberland County Superior Court Judge George H. Stanger lowered a *second-degree aggravated manslaughter charge* Friday against *convicted killer* Charles "C.J." Hill to a third-degree offense and sentenced Hill, a Bridgeton resident, to three years in state prison for the Dec. 22, 1989 death of Charles "Cocky" Bryant. (emphasis added).

Hill claims that *The News* published this report with full knowledge of its inaccuracies. Specifically, he alleges the article was inaccurate because 1) the headline erroneously labels Hill's conviction as a "killing," when it was simply an aggravated assault; 2) Hill was convicted of second degree aggravated assault, not second degree aggravated manslaughter; and 3) Hill is not a "convicted killer." He asserts that these errors impugned his reputation.

Soon after the publication of this article, Hill wrote to the paper complaining of the inaccuracies. He received no response. Approximately eleven months after the December 4, 1993 article, Hill's attorney complained in writing about references to Hill as a killer and demanded a retraction. *The News* promptly printed a retraction. Like the earlier article, the retraction appeared on page one of the December 23, 1994 edition; it said:

A Dec. 4, 1993 story in the Bridgeton Evening News incorrectly stated that Charles "C.J." Hill had been convicted of manslaughter in the 1989 stabbing of Charles "Cocky" Bryant. Hill was actually convicted of second-degree aggravated assault.

The story also stated that Hill was responsible for the death of Bryant. Court records indicate that no such responsibility was assigned to Hill or any other person.

The News regrets the error.

On November 28, 1994, plaintiff filed a complaint against defendant Evening News Company and other unnamed defendants for publishing defamatory statements about him on December 4, 1993. In an amended complaint he named the following persons as defendants: Kay Rudderow, the reporter; John M. Ewing, the publisher; Jack Hummel, the managing editor, and Gary Miller, the night editor.

In his oral opinion, the motion judge found that the December 4, 1993 article was inaccurate but not defamatory. He phrased the issue as "whether referring to someone as a 'convicted killer' is a term of art in the legal sense, which it is not, or whether it would in the layman's sense leave impressions that are so inappropriate and incorrect as to be defamatory."

He considered the word "killer" legally neutral because a death ensued as a result of an altercation. He then applied the standard announced in *Brill v. Guardian Life Ins. Co. of Am.*, 142 *N.J.* 520, 666 *A.2d* 146, (1995), governing summary judgment motions and concluded "it is hard for the Court to imagine that a jury would determine that language to be defamatory." He noted that an inaccurate statement by a newspaper is governed by a different standard for purposes of defamation. He stated that the inaccuracy "does not rise to the level of being malice-motivated, evil intentions,...." Therefore, he concluded that the inaccurate report was not defamatory as a matter of law.

No party disputes the inaccuracy of the December 4, 1993 article. The issue, then, is whether the inaccuracies are defamatory and, if so, whether Hill was a private person or public figure at the time of publication. If the statements are defamatory, Hill's status governs the standard applied to determine defendants' liability for defamation.

■ A defamatory statement is one that is false and 1) injures another person's reputation; 2) subjects the person to hatred, contempt or ridicule; or 3) causes others to lose good will or confidence in that person. *Romaine v. Kallinger*, 109 *N.J.* 282, 289, 537 *A.2d* 284 (1988) (citing *Leers v. Green*, 24 *N.J.* 239, 251, 131 *A.2d* 781 (1957)). A defamatory statement "tends so to harm the reputation of another so as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." *Restatement (Second) of Torts* § 559 (1977).

■ The threshold issue in any defamation claim is "whether the statement at issue is reasonably susceptible of a defamatory

meaning." *Romaine, supra,* 109 *N.J.* at 290, 537 *A.*2d 284; *Kotlikoff v. The Community News,* 89 *N.J.* 62, 67, 444 *A.*2d 1086 (1982). The court must evaluate the statement "according to the fair and natural meaning which will be given it by reasonable persons of ordinary intelligence." *Herrmann v. Newark Morning Ledger Co.,* 48 *N.J.Super.* 420, 431, 138 *A.*2d 61 (App.Div.1958); *see also Decker v. The Princeton Packet, Inc.,* 116 *N.J.* 418, 425, 561 *A.*2d 1122 (1989); *DeVries v. McNeil Consumer Prods. Co.,* 250 *N.J.Super.* 159, 166, 593 *A.*2d 819 (App.Div.1991). The court also must evaluate the content of the statement in the context of the publication as a whole. *Romaine, supra* ; *DeVries, supra; see also Molin v. The Trentonian,* 297 *N.J.Super.* 153, 159, 687 *A.*2d 1022 (App.Div.) (newspaper headline must be construed in context of accompanying article), *certif. denied,* 152 *N.J.* 190, 704 *A.*2d 20 (1997). However, certain statements are defamatory *per se,* including statements that the subject of the statement committed a crime. *DeVries, supra.*

In *Molin, The Trentonian* published an article about plaintiff's arrest for stalking. The headline on page one read "STALKER'S ARREST ENDS YEAR OF TERROR," with a photo of plaintiff next to the headline with the caption "CHARGED" under his picture. *Molin, supra,* 297 *N.J.Super.* at 156, 158, 687 *A.*2d 1022. Plaintiff claimed the statements were defamatory because he was not found guilty of the crime and that he only was an "alleged stalker." *Id.* at 156, 687 *A.*2d 1022. However, this court affirmed the judge's decision that "[n]either the article nor headline, read in context," were false. *Id.* at 159, 687 *A.*2d 1022. Police reports documented the "year of terror" that precipitated the anti-stalking law. Plaintiff admitted he was arrested for stalking and this was the gist of the article. *Ibid.*

■ A plaintiff does not make a *prima facie* claim of defamation if the contested statement is essentially true. A minor misstatement "which is immaterial to, or does not go to the gist or sting of the libel does not render an otherwise true statement defamatory." *Herrmann, supra,* 48 *N.J.Super.* at 431–32, 138 *A.*2d 61. In

*Herrmann,* the *Newark Star Ledger* printed an article about a labor union official who was "called on the carpet" for attending union conventions without proper accreditation. *Id.* at 426, 138 *A.*2d 61. In its report, the newspaper erred by stating the official was a member of Local No. 32 when he actually was a member of Local No. 20. *Id.* at 432, 138 *A.*2d 61. This court held that the error was immaterial and did not adversely impact the overall veracity of the statement. *Ibid.; see also La Rocca v. New York News, Inc.,* 156 *N.J.Super.* 59, 61, 383 *A.*2d 451 (App.Div.1978) (content of editorial cartoon was essentially true, although it falsely depicted teacher's arrest as occurring in a classroom).

In the case before us, *The News* reported in its December 4 edition that Hill was a "convicted killer" and that he was convicted of second-degree aggravated manslaughter. Plaintiff claimed he was not a "convicted killer" because the jury only convicted him of second-degree aggravated assault. *N.J.S.A.* 2C:12–1b defines aggravated assault as attempting to cause serious bodily injury to another or causing such injury purposely, knowingly, or recklessly, with extreme indifference to human life. The death of the victim is not an element of the crime.

Defendants claim the article taken as a whole was substantially true. However, the term "convicted killer" when used in conjunction with reference to a manslaughter charge reasonably could connote criminal culpability for the death of another.

These inaccuracies are beyond the immaterial reporting errors in *Herrmann* and *La Rocca.* Even when read in the context of the entire article, the statements conveyed the impression that Hill killed Bryant and was convicted on charges greater than aggravated assault. Labelling Hill as a "convicted killer" certainly impugned his reputation and would engender the hatred of others. Prior to this incident, Hill had a minor criminal record. He had been convicted in 1984 in municipal court of receiving stolen property and filing a false report; he was fined $125. Accordingly, we conclude that the article was not neutral and the false statements were defamatory.

The law of defamation distinguishes between public figures and private persons. Public figures are persons who have 1) "assumed roles of especial prominence in the affairs of society" or 2) "thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved." *Gertz v. Robert Welch, Inc.,* 418 *U.S.* 323, 345, 94 *S.Ct.* 2997, 3009, 41 *L. Ed.*2d 789, 808 (1974). A person classified in the second group has the following characteristics:

> First, the individual had to voluntarily inject himself into the controversy. Second, the controversy had to be a *public* one. Third, *by virtue of* the public controversy, the individual became a public figure for a limited range of issues. Fourth, the person had to assume a *"special"* prominence in the resolution of the public question.
>
> [*Lawrence v. Bauer Publ'g & Printing, Ltd.,* 89 *N.J.* 451, 472, 446 *A.*2d 469 (1982) (Schreiber, J., dissenting) (citing *Gertz, supra,* 418 *U.S.* at 351, 94 *S.Ct.* at 3012, 41 *L. Ed.*2d at 812).]

Public figures enjoy less protection from defamatory statements than do private persons because they have "voluntarily exposed themselves to increased risk of injury from defamatory falsehood concerning them." *Gertz, supra,* 418 *U.S.* at 345, 94 *S.Ct.* at 3010, 41 *L. Ed.*2d at 808; *see Lawrence, supra,* 89 *N.J.* at 464–65, 446 *A.*2d 469 (founder of taxpayers' association who spoke publicly on behalf of association and initiated petition drive concerning firehouse appropriation considered a public figure for purposes of libel suit). A public figure may not recover damages resulting from a defamatory falsehood unless defendant made the statement with "actual malice." *New York Times Co. v. Sullivan,* 376 *U.S.* 254, 279–80, 84 *S.Ct.* 710, 726, 11 *L. Ed.*2d 686, 706 (1964). In this context, "actual malice" does not require the statement be made with ill will or spite, just "knowledge that it was false or with reckless disregard of whether it was false or not." *Id.* at 280, 84 *S.Ct.* at 726, 11 *L. Ed.*2d at 706. Private persons need only demonstrate the defamatory statement was made negligently. *Costello v. Ocean County Observer,* 136 *N.J.* 594, 612, 643 *A.*2d 1012 (1994). The classification of a plaintiff as a public or private figure is a question of law to be determined initially by the motion or trial judge. *Marcone v. Penthouse Int'l Magazine for Men,*

754 *F.*2d 1072, 1082 n. 4 (3d Cir.), *cert. denied,* 474 *U.S.* 864, 106 *S.Ct.* 182, 88 *L. Ed.*2d 151 (1985).

Within the category of public figure, there are two sub-categories. In the first, a person is considered a public figure for all purposes because the person occupies a position of such persuasive power and influence. *Wolston v. Reader's Digest Ass'n, Inc.,* 443 *U.S.* 157, 164, 99 *S.Ct.* 2701, 2706, 61 *L. Ed.*2d 450, 458 (1979) (quoting *Gertz, supra,* 418 *U.S.* at 345, 94 *S.Ct.* at 3009, 41 *L. Ed.*2d at 808). In the second and most common instance, a person has thrust himself to the forefront of a particular controversy in order to influence the resolution of the issue. *Ibid.* Such a person is referred to as a limited purpose public figure. *See Gertz, supra,* 418 *U.S.* at 345, 94 *S.Ct.* at 3009, 41 *L. Ed.*2d at 808. Defendant is clearly not an all purpose public figure. The inquiry then is whether his participation in a brawl which involved the death of one man made him a limited purpose public figure.

In *Wolston,* a person subpoenaed to appear before a federal grand jury investigating Soviet espionage activities in the United States failed to appear, was cited for contempt, and entered a guilty plea to the contempt charge. He was never charged or convicted of any espionage activity. A book published twenty years later referred to him as a Soviet agent. The Court rejected the notion that Wolston should be a limited purpose public figure because he had not "voluntarily thrust" or injected himself into the forefront of a public controversy. *Wolston, supra,* 443 *U.S.* at 166, 99 *S.Ct.* at 2706–07, 61 *L. Ed.*2d at 459. The Court observed:

> It would be more accurate to say that petitioner was dragged unwillingly into the controversy. The Government pursued him in its investigation. Petitioner did fail to respond to a grand jury subpoena, and this failure, as well as his subsequent citation for contempt, did attract media attention. But the mere fact that petitioner voluntarily chose not to appear before the grand jury, knowing that his action might be attended by publicity, is not decisive on the question of public-figure status.
>
> [*Id.* at 166–67, 99 *S.Ct.* at 2707, 61 *L. Ed.*2d at 459–60.]

The Court emphasized that a court must focus on the "nature and extent of an individual's participation in the particular controversy giving rise to the defamation." *Id.* at 167, 99 *S.Ct.* at 2707, 61 *L.*

*Ed.*2d at 460 (quoting *Gertz, supra,* 418 *U.S.* at 352, 94 *S.Ct.* at 2997, 41 *L. Ed.*2d at 789). Where Wolston limited his involvement to that necessary to defend himself against the contempt charge, his involvement as a subpoenaed witness in a federal grand jury investigation of Soviet espionage activity did not render him a public figure. *Ibid.* Thus, Wolston was not required to prove that the author's identification of him as a Soviet agent was made with actual malice.

The Court also said the mere fact that an event was newsworthy does not conclusively resolve the public figure issue. *Ibid.* Indeed, the Court stated "[a] private individual is not automatically transformed into a public figure just by becoming involved in or associated with a matter that attracts public attention." *Ibid.* Moreover, the Court specifically rejected the contention that any person who engages in criminal conduct automatically becomes a limited purpose public figure for purposes of comment on issues related to his conviction. *Id.* at 168, 99 *S.Ct.* at 2708, 61 *L. Ed.*2d at 460.

In *Marcone, supra,* the Court of Appeals for the Third Circuit concluded that a private attorney, who publicized his participation in activities of a notorious motorcycle gang, was a limited purpose public figure with regard to media comment about his connection with illicit drug activities. The court focused on whether drug trafficking was a public controversy and the nature and context of Marcone's participation in the controversy. *Marcone, supra,* 754 *F.*2d at 1082. It acknowledged that criminal activity itself did not create public figure status but reasoned that it was one of many elements to be considered. *Id.* at 1085. It underscored Marcone's voluntary association with the gang and his various attempts to publicize his association as significant factors in its analysis. *Ibid.* The former boyfriend of a famous movie actress was also considered a limited purpose public figure because he actively solicited publicity for himself through his relationship. *Wynberg v. National Enquirer, Inc.,* 564 *F.Supp.* 924, 929 (C.D.Cal.1982).

 Solicitation of public attention, however, is not the dispositive consideration for limited purpose public figure status. The controversy must also be one of public concern. The fact that the divorce litigation between socialites was highly publicized did not render the matter one of public concern. Thus, the Court concluded that the litigants were not public figures. *Time, Inc. v. Firestone*, 424 *U.S.* 448, 96 *S.Ct.* 958, 47 *L. Ed.*2d 154 (1976).

Several cases have directly addressed the status of a criminal defendant. Each has followed the *Wolston* analysis and has observed the *Wolston* caution that newsworthiness alone is not the dispositive factor.

In *Street v. National Broad. Co.*, 645 *F.*2d 1227 (6th Cir.), *cert. denied*, 454 *U.S.* 815, 102 *S.Ct.* 91, 70 *L. Ed.*2d 83 (1981), the court examined the public figure status of the accusing witness in the widely publicized trial in 1931 of the Scottsboro Nine. Street filed suit when a broadcast many years after the trial portrayed her as a woman who falsely accused nine innocent men of rape. The defendants in that trial were nine African–American youths accused of rape of a white woman. The court noted that ordinarily the victim, even in a sensational case, could not be considered a public figure because her involvement in the public controversy was involuntary. *Id.* at 1234. On the other hand, if the victim had falsely accused the defendants, her participation in the event was voluntary. *Ibid.* Furthermore, the court noted that when the issues of truth and voluntariness are the same and disputed, public figure status may be determined by consideration of other factors, including the prominence of the controversy and access to the media. *Ibid.*

Ultimately, the court concluded that Street was a public figure for purposes of comment on issues related to the Scottsboro Nine trial. It considered the Scottsboro Nine trial a seminal event in attracting attention to and fostering debate about the ability of the courts to deliver race-blind justice. *Ibid.* The court also found evidence that the victim actively participated in the controversy by

granting press interviews and promoting her version of the events in extra-judicial forums. *Id.* at 1234–35.

A similar result was obtained in *Friedgood v. Peters Publ'g Co.,* 521 *So.*2d 236 (Fla.Dist.Ct.App.), *review denied,* 531 *So.*2d 1353 (Fla.1988), *cert. denied,* 488 *U.S.* 1042, 109 *S.Ct.* 867, 102 *L. Ed.*2d 991 (1989). Esther Friedgood filed a defamation complaint against the publisher of *Us* magazine alleging that a book review of a book concerning her father defamed her. Friedgood's father had been convicted of killing his wife, Esther Friedgood's mother. The court held that Friedgood was a limited purpose public figure because her voluntary actions thrust her into the criminal investigation and prosecution of her father. Those actions included concealing evidence which she knew was the subject of a search warrant, wiping off fingerprints from the evidence, and telling her father the location of the concealed evidence. *Id.* at 241–42. Furthermore, the record reflected numerous instances in which Friedgood granted interviews, including a long series published in a general circulation newspaper with a significant base of readers. *Id.* at 241.

In each of these cases, the defamation plaintiff's involvement in a criminal proceeding was also accompanied by instances of extra-judicial statements. In the absence of such statements, one court held that a woman charged with murder did not become a public figure. *Mills v. Kingsport Times–News,* 475 *F.Supp.* 1005, 1009 (W.D.Va.1979). On the other hand, the Kansas Supreme Court held that a man charged with three counts of murder and three counts of aggravated kidnapping was a public figure. *Ruebke v. Globe Communications Corp.,* 241 *Kan.* 595, 738 *P.*2d 1246, 1252 (1987). The record reveals no instances in which he granted interviews or made any extrajudicial statements. Rather, the court focused on the heinous nature of the crime and concluded that the extreme nature of his own conduct made the defamation plaintiff a subject of public interest. *Ibid.* The court also noted that public figure status is not necessarily a matter of choice but

"is rather the result of acts or events which by their nature are bound to invite comment." *Ibid.*

In this case, we are hampered in our analysis of plaintiff's status as a private figure or limited purpose public figure due to the state of the record. Because the motion judge held that the statements were not defamatory as a matter of law, he did not have to address Hill's status. Accordingly, the record is limited.

*Wolston* instructs us that Hill's status solely as a defendant in a criminal case does not elevate him to a public figure. *Wolston, supra,* 443 *U.S.* at 167, 99 *S.Ct.* at 2707, 61 *L. Ed.*2d at 460. Moreover, the newsworthiness of the event is only a factor to be considered in the public versus private figure analysis. *Ibid.* Other than *Ruebke,* the cases in which a person accused of a crime or a witness in a criminal proceeding was considered a limited purpose public figure were marked by efforts of the accused or the witness to shape public perception or debate concerning the outcome of the proceedings by participating in extensive extrajudicial debate. *Ruebke* is the only case we have located which allowed criminal activity alone to elevate the accused to a limited purpose public figure. However, the offenses in *Ruebke* were by their nature the types of offenses likely to engender significant public revulsion and debate.

The charges against Hill were serious but not of a sensational variety. Hill's persistent claims of self-defense were likely to temper public outrage. Moreover, the record is barren of any suggestion that Hill sought to influence public opinion by extrajudicial statements. These factors suggest, as in *Mills,* that Hill never lost his status as a private figure.

On the other hand, we have no way of perceiving whether this offense was the subject of significant debate or was considered a sensational crime in the community. Perhaps, Hill or a person authorized by him granted interviews or made other statements which may be viewed as voluntarily thrusting himself into a public controversy. These factors are relevant to the

analysis and are not present in the record. Accordingly, we reverse the summary judgment entered in favor of defendants and remand for further proceedings on the issue of Hill's status as a limited public figure. If the Law Division judge concludes that Hill was a limited purpose public figure, defendants are entitled to summary judgment because plaintiff has failed to advance competent evidential material of malice as required by *Sullivan, supra,* 376 *U.S.* at 254, 84 *S.Ct.* at 710, 11 *L. Ed.*2d at 686. If Hill is found to be a private figure, the matter must proceed to determine whether defendants were negligent and what, if any, damages should be awarded to plaintiff.

Reversed and remanded for further proceedings consistent with this opinion.