775 A.2d 756 (2001)
342 N.J. Super. 134
DENDRITE INTERNATIONAL, INC., a New Jersey Corporation, Plaintiff-Appellant,
v.
John DOE, NO. 3, Defendant-Respondent,
John Does Nos. 1, 2 and 4, and John Does 5 through 14, inclusive, Defendants.
Superior Court of New Jersey, Appellate Division.
Argued May 22, 2001.
Decided July 11, 2001.
*759 Michael S. Vogel argued the cause for appellant (Allegaert Berger & Vogel and Robert L. Weigel (Gibson, Dunn & Crutcher) of the New York bar, admitted pro hac vice, attorneys; Mr. Vogel, Mr. Weigel, Lee G. Dunst and David A. Zonana, on the brief).
Eugene G. Reynolds argued the cause for respondent (Wacks, Mullen & Kartzman, attorneys; Mr. Reynolds, of counsel and on the brief).
Paul Alan Levy, Trenton, argued the cause for Amici Curiae, Public Citizen Litigation Group (Mr. Levy, on the joint brief) and American Civil Liberties Union of New Jersey Foundation (J.C. Salyer, on the joint brief).
Before Judges STERN, A.A. RODRÍGUEZ and FALL. *757
*758 The opinion of the court was delivered by FALL, J.A.D.
In this opinion, we examine the appropriate procedures to be followed and the standards to be applied by courts in evaluating applications for discovery of the identity of anonymous users of Internet Service Provider (ISP) message boards.
Information contained in postings by anonymous users of ISP message boards can form the basis of litigation instituted by an individual, corporation or business entity under an array of causes of action, including breach of employment or confidentiality agreements; breach of a fiduciary *760 duty; misappropriation of trade secrets; interference with a prospective business advantage; defamation; and other causes of action.
Plaintiff, Dendrite International, Inc. (Dendrite), on leave granted, appeals from an interlocutory order of the trial court denying its request to conduct limited expedited discovery for the purpose of ascertaining the identity of defendant, John Doe No. 3, from Yahoo!, an ISP. Here, the posting of certain comments about Dendrite on a Yahoo! bulletin board by defendant, John Doe No. 3, forms the basis of the dispute in this appeal in the context of a cause of action based on Dendrite's claims of defamation.[1] We affirm the denial of Dendrite's motion based on the conclusion of the motion judge that Dendrite failed to establish harm resulting from John Doe No. 3's statements as an element of its defamation claim.
We offer the following guidelines to trial courts when faced with an application by a plaintiff for expedited discovery seeking an order compelling an ISP to honor a subpoena and disclose the identity of anonymous Internet posters who are sued for allegedly violating the rights of individuals, corporations or businesses. The trial court must consider and decide those applications by striking a balance between the well-established First Amendment right to speak anonymously, and the right of the plaintiff to protect its proprietary interests and reputation through the assertion of recognizable claims based on the actionable conduct of the anonymous, fictitiously-named defendants.
We hold that when such an application is made, the trial court should first require the plaintiff to undertake efforts to notify the anonymous posters that they are the subject of a subpoena or application for an order of disclosure, and withhold action to afford the fictitiously-named defendants a reasonable opportunity to file and serve opposition to the application. These notification efforts should include posting a message of notification of the identity discovery request to the anonymous user on the ISP's pertinent message board.
The court shall also require the plaintiff to identify and set forth the exact statements purportedly made by each anonymous poster that plaintiff alleges constitutes actionable speech.
The complaint and all information provided to the court should be carefully reviewed to determine whether plaintiff has set forth a prima facie cause of action against the fictitiously-named anonymous defendants. In addition to establishing that its action can withstand a motion to dismiss for failure to state a claim upon which relief can be granted pursuant to R. 4:6-2(f), the plaintiff must produce sufficient evidence supporting each element of its cause of action, on a prima facie basis, prior to a court ordering the disclosure of the identity of the unnamed defendant.
Finally, assuming the court concludes that the plaintiff has presented a prima facie cause of action, the court must balance the defendant's First Amendment right of anonymous free speech against the strength of the prima facie case presented and the necessity for the disclosure of the *761 anonymous defendant's identity to allow the plaintiff to properly proceed.
The application of these procedures and standards must be undertaken and analyzed on a case-by-case basis. The guiding principle is a result based on a meaningful analysis and a proper balancing of the equities and rights at issue.
With these principles in mind, we now turn to an analysis of Dendrite's action against John Doe No. 3 and the trial court's decision.
Dendrite is a New Jersey corporation based in Morristown that provides "highly specialized integrated product and service offerings for the Pharmaceutical and Consumer Package Goods (CPG) industries." Dendrite is publicly traded and has offices located in 21 countries.
"The Internet is an international network of interconnected computers[,]" providing "a unique and wholly new medium of world-wide human communication." Reno v. American Civil Liberties Union, 521 U.S. 844, 849-50, 117 S.Ct. 2329, 2334, 138 L. Ed.2d 874, 884 (1997). In further describing the Internet and the services available, the Supreme Court noted, in part:
Individuals can obtain access to the Internet from many different sources, generally hosts themselves or entities with a host affiliation.... Several major national "online services" ... offer access to their own extensive proprietary networks as well as a link to the much larger resources of the Internet....
Anyone with access to the Internet may take advantage of a wide variety of communication and information retrieval methods....
....
The best known category of communication over the Internet is the World Wide Web, which allows users to search for and retrieve information stored in remote computers, as well as, in some cases, to communicate back to designated sites. In concrete terms, the Web consists of a vast number of documents stored in different computers all over the world....
....
The Web is thus comparable, from the reader's viewpoint, to both a vast library including millions of readily available and indexed publications and a sprawling mall offering goods and services.
From the publishers' point of view, it constitutes a vast platform from which to address and hear from a worldwide audience of millions of readers, viewers, researchers, and buyers. Any person or organization with a computer connected to the Internet can "publish" information. Publishers include government agencies, educational institutions, commercial entities, advocacy groups, and individuals. Publishers may either make their material available to the entire pool of Internet users, or confine access to a selected group, such as those willing to pay for the privilege. "No single organization controls any membership in the Web, nor is there any single centralized point from which individual Web sites or services can be blocked from the Web."
[Id. 521 U.S. at 850-53, 117 S.Ct. at 2334-36, 138 L.Ed.2d at 884-86. (citations and footnotes omitted).]
Yahoo! is an ISP that, among other things, provides a service where users may post comments on bulletin and message boards related to the financial matters of particular companies. Yahoo! maintains a message board for every publicly-traded company and permits anyone to post messages on it. As such, Yahoo! operates a bulletin board specifically devoted to Dendrite, *762 hosting exchanges of messages and comments about issues related to the company's stock performance. Generally, users of the bulletin boards post messages anonymously under pseudonyms. Yahoo! requires, however, that users provide identifying information, including real names, mailing addresses, and e-mail addresses prior to using the service. Nonetheless, Yahoo! guarantees to a certain extent that information about the identity of their individual subscribers will be kept confidential. Yahoo!'s privacy policy states that:
As a general rule, Yahoo! will not disclose any of your personally identifiable information except when we have your permission or under special circumstances, such as when we believe in good faith that the law requires it or under the circumstances described below.
....
Yahoo! may also disclose account information in special cases when we have reason to believe that disclosing this information is necessary to identify, contact or bring legal action against someone who may be violating Yahoo!'s Terms of Service or may be causing injury to ... anyone ... that could be harmed by such activities.
The postings by John Doe No. 3 on the Yahoo! Dendrite message board must be viewed in the following context. Dendrite filed its Quarterly Report for the second quarter of 1999 with the Securities and Exchange Commission (SEC) in August of 1999. In this report, Dendrite stated:
Historically, we have generally recognized license fees as revenue using the percentage of completion method over a period of time that begins with execution of the license agreement and ends with the completion of initial customization and installation, if any. However, we believe that with some of our newer sales force software products, such as, ForcePharma and SalesPlus, our customers will not require customization and therefore we may be able to recognize license fees from these products upon delivery.
Following the release of this report, several stock analysts commented on the disclosures therein. The Center for Financial Research and Analysis, Inc. (CFRA) issued a report in September 1999 specifically addressing what it characterized as Dendrite's "Change in Revenue Recognition." The CFRA report concluded that due to the apparent change indicated in its Quarterly Report, Dendrite's revenue recognition would provide an earnings boost and was actually one of the reasons for Dendrite's then-improved financial condition. Further, the CFRA report opined that the associated earnings boost may have "masked weaknesses in the company's core segment."
An Internet website, "TheStreet.com," published a similar article concerning Dendrite in September 1999, also responding to Dendrite's Quarterly Report. There, TheStreet.com noted several "red flags" about Dendrite, including its "more aggressive recognition of revenue." The author of the article stated that this change in Dendrite's revenue recognition policy "could mean more revenue up front."
Thereafter, at least two users of the Yahoo! Dendrite bulletin board mentioned the CFRA report and the article from TheStreet.com in respective postings. On September 21, 1999 one poster, citing the CFRA report, commented on Dendrite's purported accounting and operational problems. On September 22, 1999 another poster, citing TheStreet.com article, noted changes in Dendrite's policy of recognizing revenue. Sometime after the CFRA report was released Dendrite responded, denying it changed its revenue *763 recognition policy as asserted in the CFRA report.
During the period from March 14, 2000 through June 2, 2000 John Doe No. 3, posted nine comments on the Yahoo! Dendrite bulletin board under the pseudonym "xxplrr." Three of these comments related to purported changes in Dendrite's revenue recognition accounting. Specifically, these comments included the following:
John's [ (Dendrite president John Bailye) ] got his contracts salted away to buy another year of earningsand note how they're changing revenue recognition accounting to help it.
....
Bailye has his established contracts structured to provide a nice escalation in revenue. And then he's been changing his revenue-recognition accounting to further boost his earnings (see about 100 posts back).
....
[Dendrite] signed multi-year deals with built in escalation in their revenue year-over-year (pharma cares most about total price of the contract, so they don't care; nor do they care if the price is in software or services). They also have been able to restructure their contracts with Pfizer and Lilly the same way.
The certification of Dendrite Vice President, R. Bruce Savage, submitted in support of Dendrite's discovery application, asserts that the substance of these statements are categorically false, specifically averring that Dendrite did not change its revenue recognition policy, nor are Dendrite's contracts structured to defer income.
Dendrite also takes issue with the following March 28, 2000 posting by John Doe No. 3:
[Dendrite] simply does not appear to be competitively moving forward. John [Bailye, Dendrite's president] knows it and is shopping hard. But Siebel and SAP already have turned him down. Hope Oracle does want in bad (and that's why they'll get). But it doesn't help job prospects in Morristown any does it?
Dendrite contends this statement falsely asserts Dendrite was secretly and unsuccessfully "shopping" the company. Dendrite states John Doe No. 3's claims that Dendrite is not competitive, that its president is aware of this and is trying to sell the company, and that the company is not desirable to potential purchasers, are all false.
In light of these statements, and those posted by other Yahoo! bulletin board users, Dendrite filed a verified complaint on May 24, 2000 against numerous fictitiously-named John Doe defendants, including John Doe No. 3. The complaint alleged that certain postings on the Yahoo! Dendrite bulletin board constituted breaches of contract, defamatory statements and misappropriated trade secrets. Relevant to this appeal, the complaint alleged that the aforementioned messages posted by John Doe No. 3 defamed Dendrite and misappropriated trade secrets.[2]
Since most participants on the Yahoo! Dendrite bulletin board identified themselves through the use of pseudonyms unrelated to their actual identities, Dendrite sought an order to show cause why Dendrite should not be granted leave to conduct limited discovery for the purpose of ascertaining the true identity of the John *764 Doe defendants Nos. 1 through 4. Accordingly, on June 20, 2000 the trial court issued an order directing these John Doe defendants to show cause why the relief requested by Dendrite should not be granted. The order further directed that this same notice be posted on the Yahoo! Dendrite bulletin board.
In the interim, the Public Citizen Litigation Group of Washington, D.C. filed a motion for leave to file a brief as amicus curiae. The trial court granted the motion and permitted the organization's participation.
On July 28, 2000 the motion judge heard argument on the order to show cause. At the close of argument, the judge reserved decision on Dendrite's motion to compel discovery purportedly necessary to identify these John Doe defendants.
On November 23, 2000, the motion judge issued a detailed written opinion, granting Dendrite's motion to conduct limited discovery to ascertain the identities of John Doe defendants Nos. 1 and 2, but denied the motion as to John Doe defendants Nos. 3 and 4. In reaching his decision, the judge stated, in pertinent part:
The Court has been called upon to balance an individual's right to anonymously voice their opinions against a plaintiff's right to confront his accusers.... Dendrite has not made a prima facie case of defamation against John Doe No. 3, as Dendrite has failed to demonstrate that it was harmed by any of the posted messages. Dendrite has also failed to provide this Court with ample proof from which to conclude that John Does Nos. 3 and 4 have used their constitutional protections in order to conduct themselves in a manner which is unlawful or that would warrant this Court to revoke their constitutional protections. Therefore, Dendrite's request for limited expedited discovery, including the issuance of a commission to take discovery out-of-state is denied.
The conclusions of the judge were memorialized in an order executed on December 13, 2000.
By order entered on January 31, 2001, we granted Dendrite's motion for leave to appeal from that portion of the December 13, 2000 order denying limited discovery as to John Doe No. 3.
On appeal, Dendrite presents the following arguments for our consideration:
POINT I
DISCOVERY OF THE IDENTITIES OF FICTITIOUS NAMED DEFENDANTS IS PERMISSIBLE UNDER BLACK LETTER NEW JERSEY LAW.
POINT II
PLAINTIFF'S DEFAMATION CLAIM AGAINST JOHN DOE NO. 3 CAN WITHSTAND A DISMISSAL MOTION AND, ACCORDINGLY, DISCOVERY OF HIS IDENTITY IS WARRANTED.
A. Dendrite Adequately Plead Harm to Survive a Motion to Dismiss.
B. As a Matter of Pleading, Dendrite Is Not Required to Allege Harm.
C. The Lower Court Erred to the Extent It Used a De Facto Summary Judgment Standard to Reject Dendrite's Defamation Claim.
POINT III
JOHN DOES ARE NOT ENTITLED TO SPECIAL DISCOVERY RULES TO PREVENT PLAINTIFF FROM DISCOVERING THEIR IDENTITIES.
A. Defendants Are Not Entitled to Imposition of an Unduly Burdensome Proof Standard at the Initial Stage of This Lawsuit.
*765 B. Requests for Disclosure of Defendants' True Identities Are Granted Routinely in Similar Cases Involving Subpoenas to Internet Service Providers.
C. Defendants Receive Little or No Privacy in Exchange for Their Use of Yahoo's Financial Bulletin Board and Other Services.
D. Defendant's Tortious Conduct Is Not Protected by the First Amendment and Does Not Warrant Imposition of Any Special Discovery Rules.
It is well-established that rights afforded by the First Amendment remain protected even when engaged in anonymously. Buckley v. American Constitutional Law Found., 525 U.S. 182, 197-99, 119 S.Ct. 636, 645-46, 142 L. Ed.2d 599, 609-10 (1999); McIntyre v. Ohio Elections Comm., 514 U.S. 334, 115 S.Ct. 1511, 131 L. Ed.2d 426 (1995); Talley v. California, 362 U.S. 60, 80 S.Ct. 536, 4 L. Ed.2d 559 (1960).
Anonymous pamphlets, leaflets, brochures and even books have played an important role in the progress of mankind. Talley v. California, 362 U.S., at 64, 80 S.Ct., at 538. Great works of literature have frequently been produced by authors writing under assumed names. Despite readers' curiosity and the public's interest in identifying the creator of a work of art, an author generally is free to decide whether or not to disclose his or her true identity. The decision in favor of anonymity may be motivated by fear of economic or official retaliation, by concern about social ostracism, or merely by a desire to preserve as much of one's privacy as possible. Whatever the motivation may be, at least in the field of literary endeavor, the interest in having anonymous works enter the marketplace of ideas unquestionably outweighs any public interest in requiring disclosure as a condition of entry. Accordingly, an author's decision to remain anonymous, like other decisions concerning omissions or additions to the content of a publication, is an aspect of the freedom of speech protected by the First Amendment.
[McIntyre, supra, 514 U.S. at 341-42, 115 S.Ct. at 1516, 131 L.Ed.2d at 436.]
In Buckley, supra, 525 U.S. at 197-98, 119 S.Ct. at 645-46, 142 L.Ed.2d at 606-08, the Court addressed a Colorado statute that required distributors of political petitions campaign materials to wear identifying badges and file affidavits disclosing their identity. There, the Court found the requirement that petitioners wear identifying badges was prohibitively burdensome on a person's right to anonymously exercise First Amendment rights. Id., 525 U.S. at 200, 119 S.Ct. at 646, 142 L.Ed.2d at 614-15. Specifically, the Court concluded that "[t]he badge requirement discourages participation in the petition circulation process by forcing name identification without sufficient cause." Ibid.
In Reno v. American Civil Liberties Union, supra, the Supreme Court made it clear that First Amendment Protections extend to speech on the Internet. 521 U.S. at 885, 117 S.Ct. at 2351, 138 L.Ed.2d at 906.
New Jersey's State Constitution affords even greater protection to persons' rights to free speech than does our federal Constitution, specifically providing:
Every Person may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that right. No law shall be passed to restrain or abridge the liberty of speech or of the press. In all prosecutions or indictments for libel, the truth may be given in evidence to the jury; and if it *766 shall appear to the jury that the matter charged as libelous is true, and was published with good motives and for justifiable ends, the party shall be acquitted; and the jury shall have the right to determine the law and the fact.

[N.J. Const., Art. 1, par. 6.]
Our Supreme Court has held that the rights attendant to this provision are "the most substantial in our constitutional scheme." Green Party of New Jersey v. Hartz Mountain Indus., Inc., 164 N.J. 127, 144, 752 A.2d 315 (2000) (quoting, New Jersey Coalition Against War in the Middle East v. J.M.B. Realty, 138 N.J. 326, 364, 650 A.2d 757 (1994), cert. denied, 516 U.S. 812, 116 S.Ct. 62, 133 L.Ed.2d 25 (1995)). In fact, "the reach of our constitutional provision [is] affirmative. Precedent, text, structure, and history all compel the conclusion that the New Jersey Constitution's right of free speech is broader than the right against governmental abridgement of speech found in the First Amendment." Coalition, supra, 138 N.J. at 352, 650 A.2d 757. Our Supreme Court has further clarified that our "State right of free speech is protected not only from abridgment by government, but also from unreasonably restrictive and oppressive conduct by private entities." Id. at 353, 650 A.2d 757.
Assuming John Doe No. 3's statements are lawful, they would be afforded Constitutional protection, both under the First Amendment of the Federal Constitution and our New Jersey Constitution. Accordingly, the discovery of John Doe No. 3's identity largely turns on whether his statements were defamatory or not.
"The key principle in defamation/free expression cases is the `profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open[.]'" Sedore v. Recorder Pub. Co., 315 N.J.Super. 137, 146, 716 A.2d 1196 (App.Div.1998) (quoting New York Times Co. v. Sullivan, 376 U.S. 254, 270, 84 S.Ct. 710, 721, 11 L. Ed.2d 686, 701 (1964)). "The law of defamation exists to achieve the proper balance between protecting reputation and protecting free speech." Ward v. Zelikovsky, 136 N.J. 516, 528, 643 A.2d 972 (1994); Sedore, supra, 315 N.J.Super. at 146, 716 A.2d 1196. "Thus, the purpose of the law of defamation is to strike the right balance between protecting reputation and preserving free speech." Lynch v. New Jersey Educ. Ass'n, 161 N.J. 152, 166, 735 A.2d 1129 (1999).
Dendrite argues on appeal that the motion judge imposed an inappropriate burden of proof when he evaluated whether Dendrite's claim could withstand a motion to dismiss. Dendrite asserts this burden of proof is contrary to the recognized standards applicable to motions to dismiss, which require a judge to look liberally upon a complaint at the pleading stage. Moreover, Dendrite contends harm is not an element that must be pled in a defamation action, and if it is a required element of the pleading, then it has in fact sufficiently pled that element.
In light of free speech and defamation considerations, as well as the fact that the Internet played a role in this dispute, the motion judge relied on the case of Columbia Ins. Co., v. Seescandy.Com, 185 F.R.D. 573 (N.D.Cal.1999) to resolve whether he should permit Dendrite to conduct discovery to ascertain John Doe No. 3's identity. In Seescandy.Com, the Federal District Court for the Northern District of California addressed whether it should authorize limited discovery so that plaintiff could ascertain defendant's identity so as to effectuate service. Id. at 575. There, the unknown defendant had registered an Internet domain name, "seescandy.com." Id. at 575-76. Plaintiff, the assignee of various *767 trademarks related to the operation of "See's Candy Shops, Inc.", sued the unknown defendants alleging that in registering that domain name the unknown defendant infringed on federally registered trademarks. Id. at 576. However, the actual identity of the defendant who registered the domain name was unknown to plaintiff.
Although the Seescandy.Com case did not implicate defendant's free speech rights, as alleged here, the District Court recognized the unique circumstances created by the advent of the Internet and noted the following in regards to disclosing the identity of unknown Internet users:
With the rise of the Internet has come the ability to commit certain tortious acts, such as defamation, copyright infringement, and trademark infringement, entirely on-line. The tortfeasor can act pseudonymously or anonymously and may give fictitious or incomplete identifying information. Parties who have been injured by these acts are likely to find themselves chasing the tortfeasor from Internet Service Provider (ISP) to ISP, with little or no hope of actually discovering the identity of the tortfeasor.
In such cases the traditional reluctance for permitting filings against John Doe defendants or fictitious names and the traditional enforcement of strict compliance with service requirements should be tempered by the need to provide injured parties with a forum in which they may seek redress for grievances. However, this need must be balanced against the legitimate and valuable right to participate in online forums anonymously or pseudonymously. People are permitted to interact pseudonymously and anonymously with each other so long as those acts are not in violation of the law. This ability to speak one's mind without the burden of the other party knowing all the facts about one's identity can foster open communication and robust debate. Furthermore, it permits persons to obtain information relevant to a sensitive or intimate condition without fear of embarrassment. People who have committed no wrong should be able to participate online without fear that someone who wishes to harass or embarrass them can file a frivolous lawsuit and thereby gain the power of the court's order to discover their identity.

[Id. at 578 (footnote omitted).]
In light of the particularly unique arena of discussion and communication created by the Internet forum, the District Court imposed certain limiting principles on "whether discovery to uncover the identity of a defendant is warranted" under such circumstances. Id. at 578. The court outlined a four-prong approach to this issue seeking to "ensure that this unusual procedure will only be employed in cases where the plaintiff has in good faith exhausted traditional avenues for identifying a civil defendant pre-service, and will prevent use of this method to harass or intimidate." Ibid.
"First, the plaintiff should identify the missing party with sufficient specificity such that the Court can determine that defendant is a real person or entity who could be sued in federal court." Ibid. Second, plaintiff must "identify all previous steps taken to locate the elusive defendant" to demonstrate that plaintiffs have made a good-faith effort to comply with the requirements of service of process. Id. at 579. Third, and most relevant to this appeal, "plaintiff should establish to the Court's satisfaction that plaintiff's suit against defendant could withstand a motion to dismiss." Ibid. Fourth, the moving "plaintiff should file a request for discovery *768 with the Court, along with a statement of reasons justifying the specific discovery requested as well as identification of a limited number of persons or entities on whom discovery process might be served and for which there is a reasonable likelihood that the discovery process will lead to identifying information about defendant that would make service of process possible." Id. at 580.
Relying on Seescandy.Com, the motion judge reasoned that Dendrite did not satisfy the third prong-the ability to withstand a motion to dismiss-because it failed to make out a prima facie case of defamation against John Doe No. 3. Accordingly, the judge concluded Dendrite was not entitled to conduct limited discovery to ascertain the identity of John Doe No. 3. Specifically, the judge found Dendrite failed to show that the statements posted by John Doe No. 3 caused Dendrite any harm.[3] Dendrite contends the motion judge imposed an excessively demanding burden of proof, generally not required when defending a motion to dismiss.
Dendrite cites to Printing Mart-Morristown v. Sharp Electronics Corp., 116 N.J. 739, 563 A.2d 31 (1989) to support this contention. There, our Supreme Court reviewed, in part, whether we properly upheld dismissal of a plaintiff's defamation claim for a failure to state a cause of action. Id. at 744, 563 A.2d 31. The Court initially established that the review of plaintiffs' pleadings on a motion to dismiss are entitled to deference, stating:
We approach our review of the judgment below mindful of the test for determining the adequacy of a pleading: whether a cause of action is "suggested" by the facts. In reviewing a complaint dismissed under Rule 4:6-2(e) our inquiry is limited to examining the legal sufficiency of the facts alleged on the face of the complaint. However, a reviewing court "searches the complaint in depth and with liberality to ascertain whether the fundament of a cause of action may be gleaned even from an obscure statement of claim, opportunity being given to amend if necessary." At this preliminary stage of the litigation the Court is not concerned with the ability of plaintiffs to prove the allegation contained in the complaint. For purposes of analysis plaintiffs are entitled to every reasonable inference of fact. The examination of a complaint's allegations of fact required by the aforestated principles should be one that is at once painstaking and undertaken with a generous and hospitable approach.
[Id. at 746, 563 A.2d 31 (citations omitted).]
The Court reversed, finding three of six contested statements made by defendants were "open to a defamatory meaning and actionable on their face." Id. at 766, 563 A.2d 31. Those three statements asserted plaintiffs were (1) "`ripping off'" clients; (2) plaintiffs "`were not qualified to do the work for defendant ... (if stated as fact rather than merely as opinion, an issue to be determined at trial)"; and (3) that plaintiffs "did unreasonably-priced, inadequate work." Ibid. The Court found the import of these statements to be clear, and *769 concluded "that those statements could not be held as a matter of law to be not defamatory." Id. at 766-67, 563 A.2d 31.
Dendrite's verified complaint alleges, in relevant part, the following:
46. Defendants' publication of these statements has caused irreparable harm to Dendrite for which Dendrite has no adequate remedy at law, and will continue to cause such irreparable harm unless restrained by this Court. In addition, as a proximate result of defendants' publication of these statements, Dendrite has sustained harm to its business reputation resulting in damages in an amount to be proven at trial, and Dendrite will continue to suffer additional damages in the future according to proof.
47. Dendrite is informed and believes, and thereon alleges, that defendants' publication of these statements was willful, malicious and oppressive, in that they intended to harm the business reputation of Dendrite. These acts, therefore, justify awarding of punitive damages.
In addition, the complaint highlights the postings made by John Doe No. 3, which asserted Dendrite had changed its revenue recognition policy and that Dendrite was "shopping" the company.
Dendrite argues that in applying the motion-to-dismiss standard, the motion judge ignored the Court's direction to review pleadings on motions to dismiss with liberality and generosity and, instead, applied a de facto summary judgment standard. Dendrite asserts the judge mistakenly concluded that Dendrite must prove "actual reputational injury" in its complaint.
Our review of the motion judge's analysis of the harm/injury element of Dendrite's defamation claim reveals he required more evidentiary support for the pleading than is traditionally required when applying motion-to-dismiss standards. The judge relied on McLaughlin v. Rosanio, Bailets & Talamo, Inc., 331 N.J.Super. 303, 751 A.2d 1066 (App.Div. 2000), as the basis for outlining the requirement for a defamation cause of action. However, it is clear the judge implemented an analysis that relied on more than a motion-to-dismiss standard, stating:
It is not obvious that the statements at issue are false or that Dendrite has been harmed. Dendrite has failed to show that the messages in question in any way harmed Dendrite. Although Dendrite alleges that it has been harmed and that it will continue to be harmed by the defendants' statements, saying it is so does not make the alleged harm a verifiable reality. In his reply certification, Michael Vogel, Dendrite's counsel, attempts to link the messages posted in this case to a drop in Dendrite's stock price.... Furthermore, Mr. Vogel has not purported to be an expert in the field of stock valuation and analysis, thus, he cannot draw the conclusion that the fluctuations in Dendrite's stock prices are anything more than coincidence.

Despite the fact that Plaintiff is entitled to every reasonable inference of fact in this analysis of whether a case against John Doe No. 3 could survive dismissal, the Court will not take the leap to linking messages posted on an Internet message board regarding individual opinions, albeit incorrect opinions, to a decrease in stock prices without something more concrete.

[(Emphasis added).]
This analysis reveals that the motion judge engaged in a more probing review of Dendrite's complaint and pleadings than outlined in Printing Mart, requiring specific *770 proof establishing Dendrite's harm as an element of its defamation claim. The judge found Dendrite had not established that fluctuations in its stock prices were a result of John Doe No. 3's postings, and could not find any nexus between the postings and the drop in Dendrite's stock prices.
"In the case of a complaint charging defamation, plaintiff must plead facts sufficient to identify the defamatory words, their utterer and the fact of their publication." Zoneraich v. Overlook Hosp., 212 N.J.Super. 83, 101, 514 A.2d 53 (App.Div.), certif. denied, 107 N.J. 32, 526 A.2d 126 (1986). Here, Dendrite has (1) identified the "revenue recognition" and "shopping" statements as purportedly defamatory words, (2) identified "xxplrr" (John Doe No. 3) as the utterer, and (3) established that they were in fact published on Yahoo!'s bulletin board. Accordingly, Dendrite meets the bare minimum requirements for a defamation cause of action, and would survive a motion to dismiss under the traditional application of R. 4:6-2(e).
However, application of our motion-to-dismiss standard in isolation fails to provide a basis for an analysis and balancing of Dendrite's request for disclosure in light of John Doe No. 3's competing right of anonymity in the exercise of his right of free speech.
We first note that the motion judge was not presented with an actual motion to dismiss and, as such, was not necessarily bound to a dogmatic application of the associated rules. Nonetheless, the third prong of the Seescandy.Com test requires a showing that plaintiff's claim would survive a motion to dismiss. However, a closer analysis discloses that the District Court distinguished the actual application of the third prong of the test from the traditional application of a motion-to-dismiss standard, stating:
Pre-service discovery is akin to the process used during criminal investigations to obtain warrants. The requirement that the government show probable cause is, in part, a protection against the misuse of ex parte procedures to invade the privacy of one who has done no wrong. A similar requirement is necessary here to prevent abuse of this extraordinary application of the discovery process and to ensure that plaintiff has standing to pursue an action against defendant.
[Seescandy.Com, supra, 185 F.R.D. at 579-80.]
Probable cause as it relates to obtaining warrants is a non-technical, flexible concept that does not require rigid, "technical demands for specificity and precision[.]" State v. Boyd, 44 N.J. 390, 392-93, 209 A.2d 134 (1965); Ornelas v. United States, 517 U.S. 690, 695-96, 116 S.Ct. 1657, 1661, 134 L. Ed.2d 911, 918 (1996). The District Court added that by equating this prong to the probable cause requirement for warrants, "plaintiff must make some showing that an act giving rise to civil liability actually occurred and that the discovery is aimed at revealing specific identifying features of the person or entity who committed the act." Id. at 580 (emphasis added).
In fact, the literal reading of the third prong of the Seescandy.Com test, as worded by the District Court, supports such a flexible, non-technical application of the motion to dismiss standard. Specifically, the third prong provides "plaintiff should establish to the Court's satisfaction that plaintiff's suit against defendant could withstand a motion to dismiss." Seescandy.Com, supra, 185 F.R.D. at 579 (emphasis added). The court characterized the four-prong test as "safeguards," necessary to "prevent [plaintiffs from] harrass[ing] *771 or intimidat[ing]" anonymous persons on the Internet. Ibid.
Our review of Seescandy.Com discloses that a strict application of our rules surrounding motions to dismiss is not the appropriate litmus test to apply in evaluating the disclosure issue. We conclude that the District Court envisioned this four-part test to act as a flexible, non-technical, fact-sensitive mechanism for courts to use as a means of ensuring that plaintiffs do not use discovery procedures to ascertain the identities of unknown defendants in order to harass, intimidate or silence critics in the public forum opportunities presented by the Internet.
Analogous circumstances were recently presented to the Virginia Circuit Court in In re Subpoena Duces Tecum to America Online, Inc., 2000 WL 1210372, *1 (Va. Cir. Ct. Jan.31, 2000). There, a publicly traded company sought and obtained an order from an Indiana court authorizing plaintiff to conduct discovery in order to ascertain the identities of certain John Does who posted allegedly defamatory comments on a stock-trading Internet chat room maintained by America Online (AOL). AOL refused to voluntarily comply with the order to disclose its subscribers' identities, contending disclosure of the subscribers' identities pursuant to the subpoena would impair the subscribers' First Amendment rights to speak anonymously. Id. at *2. Ultimately, the circuit court ordered AOL to disclose the identities, establishing a test functionally similar to that put forth in Seescandy.Com, as follows:
[A] court should only order a non-party, Internet service provider to provide information concerning the identity of a subscriber (1) when the court is satisfied by the pleadings or evidence supplied to that court (2) that the party requesting the subpoena has a legitimate, good faith basis to contend that it may be the victim of conduct actionable in the jurisdiction where suit was filed and (3) the subpoenaed identity information is centrally needed to advance that claim.

[Id. at *8.]
The test created by the Virginia Circuit Court departed from that state's traditional legal standard applied when ruling on a motion to quash a subpoena. Id. at *2, *7. Although the Circuit Court ordered disclosure of the identities of the John Doe defendants, it found a more probing evaluation into the "bona fides of [plaintiff's] claim was necessary in order to properly evaluate the reasonableness of the subpoena request in light of all the surrounding circumstances." Id. at *8.
The Virginia case supports the notion that when evaluating a plaintiff's request to compel an ISP to disclose the identity of a John Doe subscriber, courts may depart from traditionally-applied legal standards in analyzing the appropriateness of such disclosure in light of the First Amendment implications.
Here, although Dendrite's defamation claims would survive a traditional motion to dismiss for failure to state a cause of action, we conclude the motion judge appropriately reviewed Dendrite's claim with a level of scrutiny consistent with the procedures and standards we adopt here today and, therefore, the judge properly found Dendrite should not be permitted to conduct limited discovery aimed at disclosing John Doe No. 3's identity. Moreover, the motion judge's approach is consistent with the approach by both the District Court in Seescandy.Com, and by the Virginia Circuit Court in the America Online decision.
A defamatory statement is one that is false and 1) injures another person's reputation; 2) subjects the person to hatred, contempt or ridicule; or 3) causes *772 others to lose good will or confidence in that person. Romaine v. Kallinger, 109 N.J. 282, 289, 537 A.2d 284 (1988). A defamatory statement harms the reputation of another in a way that lowers the estimation of the community about that person or deters third persons from associating or dealing with him. McLaughlin v. Rosanio, supra, 331 N.J.Super. at 312, 751 A.2d 1066; Restatement (Second) of Torts § 559 (1977). "Words that clearly denigrate a person's reputation are defamatory on their face and actionable per se." Printing Mart-Morristown, supra, 116 N.J. at 765, 563 A.2d 31. When determining if a statement is defamatory on its face "a court must scrutinize the language `according to the fair and natural meaning which will be given it by reasonable persons of ordinary intelligence.'" Ibid. (quoting Romaine, supra, 109 N.J. at 290, 537 A.2d 284). A plaintiff does not make a prima facie claim of defamation if the contested statement is essentially true. Hill v. Evening News Co., 314 N.J.Super. 545, 552, 715 A.2d 999 (App.Div.1998).
The motion judge determined that Dendrite failed to demonstrate the statements posted by John Doe No. 3 caused it any harm. The certification of Dendrite Vice President, Bruce Savage alleges John Doe No. 3's postings "may ... have a significant deleterious effect on Dendrite's ability to hire and keep employees." (Emphasis added). Dendrite also contends that John Doe No. 3's postings caused detrimental fluctuations in its stock prices.
Dendrite's NASDAQ trading records were submitted to the court for the period of March 1, 2000 through June 15, 2000. Those records indicate Dendrite experienced gains on 32 days, losses on 40 days, and no change on two days during that period, which overlaps the period when John Doe No. 3 was posting his statements on the Yahoo! bulletin board. Dendrite's total loss during this period was 29/32 of a point.
Moreover, John Doe No. 3 made nine postings, two on the same day. On three of the days that immediately followed a posting by John Doe No. 3, Dendrite's stock value decreased. However, on five of the days that immediately followed a posting by John Doe No. 3, Dendrite's stock value increased. The net change in Dendrite's stock value over those seven days was actually an increase of 3 and 5/8 points.
Although the motion judge stated Dendrite was "entitled to every reasonable inference of fact in this analysis[,]" he refused to "take the leap to linking messages posted on an internet message board regarding individual opinions, albeit incorrect opinions, to a decrease in stock prices without something more concrete." The record does not support the conclusion that John Doe's postings negatively affected the value of Dendrite's stock, nor does Dendrite offer evidence or information that these postings have actually inhibited its hiring practices, as it alleged they would. Accordingly, the motion judge appropriately concluded that Dendrite failed to establish a sufficient nexus between John Doe No. 3's statements and Dendrite's allegations of harm.
We are satisfied that the analysis and conclusions by Judge MacKenzie set forth in his comprehensive letter opinion dated November 23, 2000 are supported by the record. Dendrite has failed to establish that the judge abused his discretion in entering the December 13, 2000 order.
Accordingly, we affirm.
NOTES
[1] The complaint filed by Dendrite against a number of fictitiously-named defendants, including John Doe No. 3, alleged various claims for breach of contract, defamation and other actionable statements on the Yahoo! bulletin board. Although the trial court issued decisions on Dendrite's request for information concerning the identity of all fictitiously-named defendants, this appeal focuses solely on the court's denial of Dendrite's application for expedited discovery disclosing the identity of John Doe No. 3.
[2] In this appeal, Dendrite bases its application seeking disclosure of John Doe No. 3's identity on its contention that John Doe No. 3's posted messages constitute actionable defamation.
[3] The judge found the first prong satisfied because "the assumption that this court has jurisdiction and that venue is proper is not unfounded, and, without evidence to the contrary, jurisdiction will be presumed." Regarding the second prong he found "Dendrite has not provided the Court with any previously taken steps aimed at locating the defendants[;]" however, the judge reasoned Dendrite could not have been expected to know they were supposed to attempt to identify the defendants on their own since he had just invoked the Seescandy.Com test. Lastly, the judge made no findings concerning the fourth prong of the test.